IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SECURITIES AND EXCHANGE
COMMISSION                           :

    v.                               : Civil Action No. DKC 2006-0866

                                  :

SBM INVESTMENT CERTIFICATES,
INC., et al.                         :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this securities case are the motions of Plaintiff, the Securities and Exchange Commission (SEC), for preliminary relief (paper 2), to amend the court's Scheduling Order (paper 41), and for a protective order (paper 61). Defendants SBM Certificate Company (SBMCC) and SBM Investment Certificates, Inc. (SBMIC) have moved to sell specified assets (papers 57 & 58). Defendant Geneva Capital Partners, LLC ("Geneva") has moved for judgment on the pleadings or summary judgment (paper 75), and Defendant Eric M. Westbury has joined in this motion (paper 80). The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no further hearing being deemed necessary.[1] For the reasons that follow, the court will grant in part the SEC's motion for preliminary relief and will grant the SEC's motions for amendment of the Scheduling Order and for a protective order. The court will deny the motions of SBMCC

---

[1] Evidentiary hearings were held on May 12, 2006, and June 19, 2006, but these hearings related only to the SEC's motion for preliminary relief.

and SBMIC to sell assets and the motion of Geneva and Westbury for summary judgment or judgment on the pleadings.

## I.  Background

There are four Defendants in this action.  Two Defendants, SBMCC and SBMIC, are face amount certificate companies registered with the SEC pursuant to  section 8(a) of the Investment Company Act, 15 U.S.C. § 80a-8(a).[2]  The two other Defendants are a corporate parent of the face amount certificate companies, Geneva, and an individual, Westbury, who controls each of the entity-Defendants.  SBMCC is a Maryland corporation that is wholly owned by SBM Financial, LLC.  SBM Financial, LLC is, in turn, wholly owned by Geneva.  Geneva is wholly owned by Geneva Financial Holdings, LLC, which is wholly owned by Westbury.   Westbury is also the Chairman of the Board of Directors, Chief Executive Officer, and President of SBMIC.

Andrea Dittert, a Supervisory Staff Accountant for the SEC who worked on the investigation in this case, explains that:

> [f]ace-amount certificate companies issue fixed-income debt securities; these companies agree to pay the principal amount of the instruments (the "face amount") plus accrued interest on maturity.  Their profitability is dependent upon the difference between the return they generate on their investment portfolio and the expenses incurred from

---

[2]  SBMIC was formerly known as 1st Atlantic Guaranty Corporation.

            selling    and    satisfying    certificate
            obligations.[3]

(Paper 2, Attachment 2, Dittert Decl., at 4 ¶ 16).  SBMCC and SBMIC

both  maintain  outstanding  face  amount  certificates.   These

certificates require the issuing company to pay investors interest

at specified intervals and to return the principal to the investor

upon the maturity of the certificate.  The certificates sold by

SBMCC mature after either twenty-eight or thirty years and include

successive three, five, seven, or ten-year guarantee periods prior

to maturity.  Within each guarantee period, the certificates pay a

fixed  amount  of  interest  and  any  withdrawal  of  principal  by

investors incurs a penalty.  At the end of each guarantee period,

if an investor takes no action, the principal rolls over to the

next guarantee period until the maturity date is reached.   The

investor has the option to request the withdrawal of the entire

principal without penalty at the end of each interim guarantee

period.  If the investment is rolled over, the interest rate can be

adjusted.   SBMIC's certificates operate under similar terms, but

have maturities of twenty years with interim guarantee periods of

one, three, five, or ten years.

     Geneva is involved in financial transactions related to a

charter school financing program operated by the District of

_____

     [3] Defendants maintain that this explanation of the business of
face amount certificate companies is incomplete, but do not offer
a fuller explanation.  (Paper 10, at 3).

Columbia.  That program utilizes government funds to extend loans and guarantee private loans to charter schools in the District of Columbia.  The District of Columbia invested approximately $15 million from its charter school financing program by purchasing fixed interest rate certificates from Geneva pursuant to terms contained in a Private Offer Memorandum (POM).  As part of the same transaction, Geneva extended a revolving line of credit to the District of Columbia that it used to fund loans made to charter schools.  The District of Columbia also deposited securities and other assets with Geneva.  Geneva provided the District of Columbia with a total of approximately $15 million in funds under the revolving credit agreement.

In 2002, the SEC began investigating fraud by John Lawbaugh, a former executive of SBMCC and SBMIC, involving misappropriation of millions of dollars from these companies and from investors. The SEC ultimately filed a civil enforcement action based on that fraud that resulted in disgorgement against Lawbaugh and final injunctive relief against Lawbaugh and the face amount certificate companies.  *Sec. & Exch. Comm'n v. Lawbaugh*, 359 F.Supp.2d 418 (D.Md. 2005).  Lawbaugh, formerly the majority shareholder in both SBMCC and SBMIC, filed bankruptcy and his estate was liquidated. The SEC supported Westbury and Geneva in their effort to take control of SBMCC and SBMIC, which succeeded when the bankruptcy

court approved their purchase of the stock of both companies from Lawbaugh's bankruptcy estate in December 2003.

The SEC conducted a follow-up examination of SBMCC and SBMIC, which was concluded in September 2005, and as a result of that examination opened a formal investigation of these companies. The SEC filed its complaint in this case on April 4, 2006. The complaint asserts three claims for relief. First, it alleges that SBMCC and SBMIC violated the qualified reserve requirements for face amount certificate companies required by section 28 of the Investment Company Act of 1940, 15 U.S.C. § 80a-28. Second, the SEC alleges securities fraud, in violation of section 17a of the Securities Act of 1933, 15 U.S.C. § 77q(a); section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and rule 10b-5 under the Securities Exchange Act, 17 C.F.R. § 240.10b-5. The SEC alleges that SBMCC, SBMIC, and Westbury committed fraud against investors who hold SBMCC and SBMIC face amount certificates. The SEC also alleges that Geneva and Westbury committed fraud against the District of Columbia. Finally, the SEC alleges that Westbury and Geneva violated fiduciary duties imposed by section 206(1)&(2) of the Investment Advisors Act of 1940, 15 U.S.C. § 80b-6(1)&(2), through the alleged fraud upon the District of Columbia.

The same day that the SEC filed its complaint, it also moved for preliminary relief. (Paper 2). In this motion, the SEC seeks a temporary restraining order and a preliminary injunction against

future violations of the securities laws, a preliminary injunction freezing Defendants' assets, appointment of a receiver for the entity-Defendants, an order requiring a full accounting, a preliminary injunction against destruction of evidence, and orders providing for expedited discovery and alternative means of service.

This court issued an Order on April 4, 2006, imposing temporary relief pending a hearing. That Order requires Defendants to notify this court and the SEC upon receipt of any demand for payment from investors and to wait at least seven days after notification to make such a payment. (Paper 6). After conducting a hearing, this court issued a second Order on May 12, 2006, maintaining the provisions of the earlier Order in force, clarifying that the same provisions apply to interest payments due to investors, and requiring Defendants to produce all documents supporting SBMCC's claim that it owns loans made to District of Columbia charter schools. (Paper 18). In response to these Orders, Defendants have pledged not to pay investor demands covered by this court's Orders except under the court's direction. (*See, e.g.*, paper 9). An evidentiary hearing was held on June 19, 2006, in which Defendants and the SEC presented witnesses relating to the status of District of Columbia charter school loans. The SEC also presented evidence about the reserves and financial condition of SBMCC and SBMIC.

In response to this court's preliminary Orders, Defendants have filed seven notifications regarding demands for payment by investors.  (Papers 9, 12, 16, 27, 29, 34, 49).  SBMCC reported requests by investors for return of principal, payments including principal and interest due in the ordinary course of its business, and interest payments due under the terms of its face amount certificates.  SBMIC reported only interest amounts due under the terms of its face amount certificates.  The requests for payment reported by Defendants are summarized in the following table.[4]

| Notice Number | SBMCC redemption demands | SBMCC normal-course redemption due | SBMCC interest due | SBMIC interest due |
|---|---|---|---|---|
| 1 | $631,590.28 | $281,383.89 | $46,207.58* | $3,571.95* |
| 2 | $1,618,250.61 | $136,703.37 | $6,981.40 | $0.00 |
| 3 | $837,929.11 | $33,111.17 | $24,955.23 | $0.00 |
| 4 | $456,604.61 | $6,643.12 | $18,719.61 | $219.59 |
| 5 | $41,923.11 | $0.00 | $15,506.93 | $0.00 |
| 6 | $233,754.86 | $0.00 | $31,349.11 | $219.59 |
| 7 | $501,277.17 | $284,611.82 | $64,524.66 | $5,165.90 |
| Total | $4,321,329.75 | $284,611.82 | $208,244.52 | $9,177.03 |

SBMCC and SBMIC have also moved to sell certain assets to take advantage of market gains.  (Paper 57 & 58).

_____

[4] The values denoted with asterisks in the table indicate interest payments that SBMCC and SBMIC indicated they intended to immediately pay as of April 24, 2006.  This court's May 12, 2006 Order clarified that interest payments were covered by the terms of the April 4, 2006 Order.

This court issued a Scheduling Order on July 13, 2006, establishing, among others, deadlines for Plaintiff's Rule 26(a)(2) expert disclosures on September 11, 2006; Defendants' Rule 26(a)(2) expert disclosures on October 11, 2006; and the end of discovery on November 27, 2006. (Paper 35). The SEC moves to amend this Order, requesting that expert disclosures be extended until after the close of fact discovery and requesting an extension of fact discovery. The SEC's motion was filed on August 15, 2006, well before the September 11, 2006 deadline originally established for Plaintiff's Rule 26(a)(2) expert disclosures and before the close of fact discovery under the Scheduling Order. Defendants timely filed their own Rule 26(a)(2) expert disclosures on October 11, 2006, noting that the SEC had not yet filed any expert disclosures and disclosing that, as a result, Defendants would not call expert witnesses. (Paper 53).

Defendants assert that they have completed fact discovery other than a deposition disputed by the SEC's motion for a protective order and certain other outstanding discovery requests directed to third parties. The SEC indicates that it has not yet completed fact discovery, and urges the issuance of a new scheduling order establishing an extended period of fact discovery and expert disclosures after the parties have an opportunity to review the court's ruling on the SEC's motion for preliminary

injunctive relief.   Defendants oppose Plaintiff's request for an extension of discovery.

Two other motions are also outstanding.   The SEC seeks a protective order quashing a deposition noticed by Westbury, and Westbury and Geneva have moved for judgment on the pleadings or, in the alternative, for summary judgment as to the SEC's fraud allegations relating to Geneva's transactions with the District of Columbia.

## II.  Standards of Review

## A.  Preliminary Injunctive Relief

The SEC has statutory authority to seek injunctive relief barring conduct that violates the federal securities laws "[w]henever it shall appear to the Commission that any person has engaged or is about to engage in any act or practice constituting a violation" of the securities laws.   15 U.S.C. § 80a-41(d) (authorizing the SEC to sue to enjoin violations of the Investment Company Act); *see also* 15 U.S.C. §§ 77t(b), 78u(d), 80b-9(d) (authorizing the SEC to sue to enjoin violations of the Securities Act, Securities Exchange Act, Investment Advisors Act, and regulations thereunder).

There is some uncertainty as to the proper standard of review for preliminary injunctions sought by the SEC.   The standard is different depending on whether the SEC seeks to enjoin future violations of the securities laws or seeks an ancillary preliminary

injunction to preserve the status quo and effectuate permanent relief after trial.  The United States Court of Appeals for the Fourth Circuit generally applies a four-factor balance of hardships test to evaluate a private plaintiff's request for a preliminary injunction:

> In determining whether to grant a preliminary injunction, a court must balance: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if it is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.

*Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*, 373 F.3d 589, 593 (4th Cir. 2004).  Some circuits hold that a federal agency does not have to show irreparable harm when it seeks to enjoin future violations of federal law based on a showing of an ongoing violation of that law.  *See, e.g.*, *Gov't of Virgin Islands, Dept. of Conservation and Cultural Affairs v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir. 1983); *Sec. & Exch. Comm'n v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir.), *reh'g denied*, 917 F.2d 98 (1990).  The First Circuit has explicitly declined to dispense with the irreparable harm requirement.  *Sec. & Exch. Comm'n v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002), *cert. denied*, 538 U.S. 1031 (2003).

1.  **Injunctions Against Future Violations**

To demonstrate the need for an injunction against future violations of the securities laws, SEC must demonstrate that it will likely be able to prove that Defendants have violated the securities laws and would be likely to commit a future violation. *Sec. & Exch. Comm'n v. Marker*, 427 F.Supp.2d 583, 590 (M.D.N.C 2006). Factors considered in this inquiry include:

> (1) the seriousness of the original violation; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved on the part of the defendant; (4) the defendant's recognition of his unlawful conduct and the sincerity of his assurances against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* (citing *Sec. & Exch. Comm'n v. Prater*, 289 F.Supp.2d 39, 49 (D.Conn. 2003)).

The Fourth Circuit has yet to consider explicitly whether a showing of irreparable harm is also required when the SEC seeks a preliminary injunction against further violation of the securities laws. In *Kemp v. Peterson*, however, it affirmed a preliminary injunction against future statutory violations sought by a federal agency without referring to any evidence of irreparable harm and without considering any balancing of equities. *Kemp v. Peterson*, 940 F.2d 110, 112-13 (4th Cir. 1991); *see also Commodity Futures Trading Comm'n v. IBS, Inc.*, 113 F.Supp.2d 830, 848-49 (W.D.N.C. 2000) (interpreting *Kemp* to allow preliminary injunctions sought by

11

an agency against future violations of the law without a showing of irreparable harm), *aff'd on other grounds*, 276 F.3d 187 (4th Cir. 2002).

## 2.  Ancillary Preliminary Injunctions

Preliminary injunctive relief ancillary to a direct injunction against future statutory violations, such as freezing assets or appointing a receiver, is judged against a different standard and may be appropriate even if the SEC has not made an adequate showing to obtain an injunction against future violations of the securities laws.  *Unifund SAL*, 910 F.2d at 1041.  A court has discretion to fashion appropriate remedies to effectuate permanent relief that would be available to the agency, but such preliminary relief requires a balancing of the equities.  *See Kemp*, 940 F.2d at 112-14.  In *Kemp*, the district court's preliminary injunction against future violations of the Interstate Land Sales Full Disclosure Act was affirmed, *id.* at 112-13, but its ancillary order freezing the defendants' personal assets to ensure fulfillment of a statutory disgorgement remedy was remanded for consideration of whether this relief was supported by the balance of the equities.  *Id.* at 114. The Fourth Circuit observed in the context of the ancillary injunction in *Kemp* that the purpose of such an injunction is "to preserve the status quo 'where the balance of hardships tips decidedly toward the party requesting the temporary relief and that party has raised questions going to the merits so serious,

12

substantial, and difficult as to make them a fair ground for litigation . . . .'" *Kemp*, 940 F.2d at 114 (quoting *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2$^d$ Cir.), *cert. denied*, 417 U.S. 932 (1974)).

## B.  Motion for Judgment on the Pleadings

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is governed by the same standard as a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Accordingly, a 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in

the light most favorable to the plaintiff.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  The court must disregard the contrary allegations of the opposing party.  *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969).  The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**C.  Motion for Summary Judgment**

Defendants Geneva and Westbury have moved for judgment on the pleadings under Fed.R.Civ.P. 12(c) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56.  A court considers only the pleadings when deciding a Rule 12(b)(6) or 12(c) motion, which are addressed under the same standard.  Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment.  *See* Fed.R.Civ.P. 12(b); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F.Supp.2d 551, 556 (D.Md. 2003).  It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her

responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.   *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.   However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).   There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.   Preliminary Injunction Against Violation of Face Amount Certificate Company Qualified Reserve Requirements

The SEC alleges that Defendants SBMCC and SBMIC violated section 28(a)&(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-28(a)&(b), by maintaining insufficient qualified reserve assets to back the companies' outstanding face amount certificates. Section 28 of the Investment Company Act of 1940 makes it unlawful for "any registered face-amount certificate company to issue or sell any face-amount certificate, or to collect or accept any payment on any such certificate issued by such company . . . unless" reserves of qualifying assets are maintained "at all times." 15 U.S.C. § 80a-28(a).   The statute establishes a complex formula for reserve requirements, subject to a minimum requirement. "At no time shall the aggregate certificate reserves herein

16

required . . ., be less than the aggregate surrender values and other amounts to which all certificate holders may be then entitled." *Id.* "Qualified investments" that can meet this reserve requirement include only:

> investments of a kind which life-insurance companies are permitted to invest in or hold under the provisions of the Code of the District of Columbia as heretofore or hereafter amended, and such other investments as the Commission shall by rule, regulation, or order authorize as qualified investments. Such investments shall be valued in accordance with the provisions of said Code where such provisions are applicable. Investments to which such provisions do not apply shall be valued in accordance with such rules, regulations, or orders as the Commission shall prescribe for the protection of investors.

15 U.S.C. § 80a-28(b).

The SEC offers evidence that SBMIC and SBMCC maintain qualified reserves that are less than their outstanding face amount certificate obligations. Defendants' unaudited records indicate that SBMCC claimed qualified assets of only $30,288,180.02 compared to $30,883,385.36 of outstanding face amount certificates as of December 2005. (Paper 2, Ex. 1, at 1-2). Likewise, SBMIC's books indicate that it claimed qualified assets of only $1,339,441 as of December 31, 2005, compared to outstanding face amount certificates totaling $2,160,980.[5]   (Paper 2, Ex. 2, at 4). The SEC also

---

[5] After this litigation commenced, Defendants provided revised figures for December 2005 that indicate higher asset balances and lower certificate liabilities. (Paper 11, at 15). Given the SEC's
(continued...)

offers testimony of Ms. Dittert that "as of September 30, 2004 it appears that approximately 66% of SBM[CC]'s total investments — or $22,859,872 of $34,730,700 were unqualified." (Paper 2, Attachment 2, Dittert Decl., at 7 ¶ 30).  Ms. Dittert indicates that SBMIC is similarly far from compliance with its qualified reserve requirements: "at the time of the Commission's last review of its books and records, almost half of [SBMIC's] portfolio consisted of unqualified investments . . . [and] six out of [SBMIC's] last ten investment purchases, were not qualified, amounting to 98% of the total value of purchases made during that time period." (Paper 2, Attachment 2, Dittert Decl., at 9 ¶¶ 44–45).

The SEC also offers evidence that there will be an ongoing violation because SBMIC and SBMCC likely will not begin to have qualified reserves greater than face amount certificate liabilities in the near future.  Ms. Dittert indicates that neither SBMIC nor SBMCC has been in compliance with reserve requirements since 2003 and that SBMCC has operated at significant losses during the past three years and, as a result, lacks income that could be used to increase qualified assets.  (Paper 2, Attachment 2, Dittert Decl., at 6).  SBMCC also included four loans to District of Columbia

---

[5](...continued)
evidence that many of the qualified assets claimed by SBMIC and SBMCC were not actually qualified and the misstatement of the charter school loans on SBMCC's books, both discussed below, the SEC has demonstrated a sufficient likelihood that it will prevail on this issue.

18

charter schools on its books as mortgages owned by SBMCC, (paper 26, at 5-7), that now appear to have been incorrectly reported.  In response to this court's May 12, 2006 Order, (paper 18), Defendants produced documentation on May 26, 2006, revealing that SBMCC funded loans that were actually made by Geneva to the District of Columbia, which in turn loaned money to the charter schools. (Paper 26, at 7).

These assets represent approximately $4.5 million out of approximately $30 million in reserves that SBMCC claimed in its December 2005 financial statement.  Defendants admit that these loans should properly be characterized as receivables due to SBMCC's transfer of assets to Geneva, (paper 26, at 7), and the SEC indicates that these receivables are a non-qualified asset.  The details of the transactions through which the charter school loans were funded represent a further obstacle to SBMCC acquiring sufficient reserves to equal its face amount certificate liability. It also demonstrates that between late 2003 and early 2005, when these loans were funded, assets were transferred out of SBMCC to fulfill Geneva's obligation to fund the charter school loans.  Ms. Dittert also testified that Geneva pledged assets belonging to SBMCC as collateral for the certificates purchased by the District of Columbia.  (Paper 32, at 33-39).

Defendants argue that the qualified reserve requirements do not apply to SBMCC and SBMIC because neither continues to sell face

19

amount certificates to investors.  The SEC argues that SBMIC and SBMCC sell securities when guarantee periods on their issued certificates expire and investors have the opportunity to roll over face amount certificates at a new interest rate or to withdraw principal without incurring a penalty.

The language of section 28 clearly demonstrates the intent of Congress to impose an ongoing obligation on registered face amount certificate companies to maintain adequate reserves, as defined in the statute, to cover their outstanding certificate obligations. Section 28(a)(2) provides that "[i]t shall be unlawful for any registered face-amount certificate company to issue or sell any face-amount certificate . . . unless . . . such company maintains *at all times* minimum certificate reserves on all its outstanding face-amount certificates." 15 U.S.C. § 80a-28(a) (emphasis added). In addition, section 28(b) ("[a]sset requirements prior to sale of certificates") requires that registered face amount certificate companies maintain the same minimum reserves as calculated under section 28(a) prior to being allowed to sell certificates.  In order for section 28(a) to have independent force, it should be interpreted to apply at and after the sale of certificates.

Furthermore, the SEC makes a persuasive argument that certificate rollovers constitute the sale or issuance of face amount certificates under section 28(a).  The parties cite no decision, nor is this court aware of any, in which any court has

20

considered whether a rollover transaction constitutes a sale of securities under section 28 of the Investment Company Act of 1940. Several courts have considered whether rollover transactions constitute a sale of securities in the context of establishing the limitations period in private suits alleging securities fraud. Courts considering that question have focused on whether there is "'. . . such a significant change in the nature of the investment or in the investment risks as to amount to a new investment.'" *Sanderson v. Roethenmund*, 682 F.Supp. 205, 209 (S.D.N.Y. 1988) (quoting *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2[d] Cir. 1977), *cert. denied*, 436 U.S. 905 (1978)). The *Sanderson* court reasoned that a rollover of short-term international certificates of deposit was not a new sale under the securities fraud provisions because the rollover was automatic and did not sufficiently change the nature of the security. "In substance, each rollover represented merely a periodic interest rate and maturity date adjustment . . . [and] was something contemplated by the [plaintiffs] when they made the initial purchases." *Id.* The decision to dismiss in *Sanderson* also rested on the alternative ground that the plaintiffs failed to plead fraud adequately under Fed.R.Civ.P. 9(b). *Id.* at 207-08. In contrast, another court reasoned that a rollover of promissory notes for mortgages constituted a new purchase of these securities because the risks associated with the investment in the mortgage changed substantially at the time of the rollover.

21

> [A] renewal would constitute a significant
> change in the investment risks.  At the point
> just prior to maturity, the risk level of the
> mortgage is dependent solely on the ability of
> the mortgagee to pay the principal at that
> moment.  At the point just after the rollover,
> the risk level is dependent on the solvency of
> the mortgagee over the entire period of the
> mortgage.

*Pollack v. Laidlaw Holdings, Inc.*, No. 90-5788, 1995 WL 261518, at
*8 (S.D.N.Y. May 3, 1995).

The reasoning of *Pollack* is highly persuasive in this case,
because, as the SEC points out, investors make a critical decision
of whether to exercise their right to immediate repayment without
penalty at the end of each guarantee period.  As with the
promissory note rollovers in *Pollack*, the risks undertaken by an
investor in Defendants' face amount certificates change
dramatically before and after the investor's decision to roll over
a certificate at the end of its guarantee period.  At the end of
the guarantee period, investors in Defendants' face amount
certificates run the risk that the issuing company will become
insolvent over only a thirty-day period because the investor can
demand repayment of principal without penalty and be entitled to
repayment within thirty days.  At the beginning of the next
guarantee period, however, the investor faces the risk of the
issuing company's financial failure over the full guarantee period
of up to ten years, subject to the investor's ability to demand
return of principal, less an early withdrawal penalty.  The

investor also is faced with a new interest rate term determined by the issuing company at the time of the investor's rollover decision.

The SEC has made a sufficient showing, at this preliminary stage, that it is likely to prevail on the question of whether Defendants SBMCC and SBMIC are required to maintain qualified reserves under section 28 of the Investment Company Act of 1940.[6]

Defendants also argue that the SEC was inconsistent in the methodology used to calculate the reserve required under section 28. Any inconsistencies as to the reserve are immaterial. Ms. Dittert testified at the June 19, 2006 hearing that both SBMCC and SBMIC fail to meet qualified reserve requirements under either calculation method because of the large proportion of non-qualifying assets held by each company. (Paper 32, at 25-26).

The SEC has offered sufficient evidence to conclude at this stage that SBMCC and SBMIC have likely violated the qualified reserve requirements and will likely continue to be in violation during the pendency of this action. Although it is not clear that a showing of irreparable harm is required, the low levels of qualified reserve assets at SBMCC and SBMIC indicate a risk of

---

[6] The SEC also asserts that SBMIC is barred by this court's previous injunction, entered in connection with the fraud investigation, from denying that it is required to maintain adequate reserves under the terms of section 28 of the Investment Company Act of 1940, but it is unnecessary to resolve this argument to decide that the SEC will likely prevail on the issue of whether the asset reserve requirements apply to SBMIC.

irreparable harm.   If Defendants are not enjoined from further depleting reserve levels, the remaining reserve assets may be insufficient to satisfy the demands of all investors, causing irreparable harm to investors who otherwise could have been more fully compensated.   Nevertheless, an injunction requiring Defendants to come into compliance with the reserve requirements is not appropriate relief at this time, because it is not clear that Defendants would have the ability to comply with such an order. The asset freeze restrictions that have been and will be imposed as ancillary injunctive relief are adequate to address this risk of irreparable harm.

## IV.  Securities Fraud

The SEC alleges securities fraud against all Defendants, under section 10(b) of the Securities Exchange Act of 1934, rule 10b-5 thereunder, and section 17a of the Securities Act of 1933, based on two separate courses of alleged fraud.   First, the SEC contends that SBMCC, SBMIC, and Westbury committed securities fraud upon certificate investors deciding whether to roll over their face amount certificates.   Second, the SEC asserts that Geneva and Westbury committed fraud upon the District of Columbia in connection with the charter school certificates and loans.   The SEC moves for preliminary injunctive relief based on these securities fraud claims, while Geneva and Westbury move for judgment on the pleadings or summary judgment as to the same claims.   Because some

elements of these claims are in dispute, both motions will be denied.

Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), prohibits the use or employment "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  Rule 10b-5, 17 C.F.R. § 240.10b-5, contains more specific prohibitions.  It provides that:

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), contains a similar prohibition, but targets fraudulent statements related to an offer to sell securities rather than to a sale of securities:

> [i]t shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The SEC must prove four elements when it brings an enforcement action for securities fraud under rule 10b-5: "the Commission must show that [Defendants] (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *McConville v. Sec. & Exch. Comm'n*, 465 F.3d 780, 786 (7th Cir. 2006).

> [A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)), *cert. denied*, 529 U.S. 1067 (2000). The question of materiality is

generally fact-specific and thus typically cannot be resolved as a matter of law.  *Krim v. Coastal Physician Group, Inc.*, 81 F.Supp.2d 621, 627 (M.D.N.C. 1998) (citing *Basic, Inc.*, 485 U.S. at 236)), *aff'd*, 201 F.3d 436 (4th Cir. 1999).   The requisite scienter for securities fraud can be satisfied by recklessness, which requires "an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the [recipient] to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999) (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir. 1978)).   A preliminary injunction against future securities law violations is a strong remedy that should be restricted to situations where a strong showing on the merits has been made.

> The prohibition against future securities law violations is among the sanctions that we have characterized as having grave consequences. Such an order subjects the defendant to contempt sanctions if its subsequent trading is deemed unlawful and also has serious collateral effects. . . . Though the order is prohibitory in form, rather than mandatory, it accomplishes significantly more than preservation of the status quo. For this form of relief, the Commission has to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition.

*Unifund SAL*, 910 F.2d at 1041.

**A.  Motion for Preliminary Injunction**

The SEC has not yet provided sufficient evidence as to scienter to support an injunction against future violations of the anti-fraud provisions of the securities laws.  The draft financial statements provided by the SEC indicate that SBMCC and SBMIC were not in reserve compliance by their own calculations, but these were not final financial calculations, and Defendants have now submitted financial estimates indicating that they were in compliance at that time.  (Paper 11, at 14-15; paper 11, Ex. 11, Westbury Aff. ¶¶ 3-4).  Based on this information, it is not clear what Defendants knew or should have known about the financial status of SBMCC and SBMIC.  Furthermore, Defendants continue to assert that reserve requirements do not apply to these companies until they resume selling face amount certificates, which also suggests that they may not have had the requisite mental state for fraud.  At this preliminary stage, the evidence does not adequately establish what SBMCC, SBMIC, or Westbury knew as to the truth or reliability of disclosures made to their investors.  The SEC alleges that SBMCC's accounting treatment of the charter school loans amounted to securities fraud, but Defendants contend that it represents only an accounting mistake that in one case was confirmed by the auditors of Defendant's financial statements.

Likewise, the SEC has not provided sufficient evidence that Geneva and Westbury committed securities fraud against the District

28

of Columbia and would commit future securities fraud to justify a preliminary injunction against future violations of the securities fraud provisions. The SEC alleges that this fraud involved Defendants' misleading disclosure that the investment was safe and Defendants' failure to disclose adequately their use of the investment funds for related companies and the nature of the District of Columbia's investment. The POM executed by Geneva and the District of Columbia disclosed to the District of Columbia that $5 million of its assets would be used to acquire SBMIC. (Paper 2, Ex. 19, at 7). The POM's disclosure provisions also noted other risks and qualifications on the District of Columbia's investment with Geneva. (*Id.* at 3, 5-11). The SEC raises legitimate questions as to whether these disclosures were adequate, but introduces insufficient evidence that such fraud would be repeated to justify an injunction against future violation of the securities fraud laws. The District of Columbia has demanded the return of its assets, (paper 14, Ex. 1), and there is no evidence that Geneva is presently seeking to sell securities to other investors.

The SEC also asserts that Defendants  and Westbury failed to disclose conflicts of interest in their transactions with the District of Columbia. The SEC asserts that Timothy Webb and Marie Williams had conflicts of interest because of their involvement both with Geneva and the District of Columbia. (Paper 2, Attachment 2, at 12). Defendants assert that they were unaware of

Webb's role with the District of Columbia.   (Paper 11, at 34).
Defendants also assert that Williams, a member of the board of
directors of SBMCC and SBMIC, served only as a consultant for the
District of Columbia and did not participate in transactions
involving Geneva.   (Paper 11, Ex. 3, Williams Aff. at 1).   As
discussed above, the SEC has established insufficient evidence that
any fraud by Geneva or Westbury would be repeated because the
District has demanded the return of its investment, and there is no
indication that Defendants are seeking additional investors.
Furthermore, the SEC's showing as to scienter for fraud based on
undisclosed conflicts of interest is lacking, because Defendants
insist that they were unaware of any conflicts of interest that may
have existed.

Finally, the SEC contends that Geneva fraudulently converted
and disposed of District of Columbia securities, but this
allegation is inferred from a lack of information in Geneva's
financial statement.   This is an insufficient showing to support
such a sweeping preliminary injunction.   As discussed above, the
SEC also has not shown that Westbury or Geneva are likely to commit
future securities fraud.

**B.   Motion for Judgment on the Pleadings or Summary Judgment**

Geneva and Westbury request judgment on the pleadings or, in
the alternative, summary judgment as to the SEC's securities fraud

allegations under section 10(b), section 17(a), and rule 10b-5, which Geneva characterize as Count II of the complaint.[7]

Geneva contends that in any securities fraud case "a plaintiff must allege that '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Ottmann v. Hangar Orthopedic Group, Inc.*, 353 F.3d 338, 342 (4th Cir. 2003) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (internal quotation marks omitted)). *Ottmann*, however, states the legal standard for a private litigant's claim for compensatory damages in the implied cause of action under section 10(b) and rule 10b-5. The elements of reliance and damages prove an element of causation and demonstrate the private plaintiff's entitlement to relief, as in a common law action for fraud. The prohibition imposed by rule 10b-5 is broader and necessarily applies to acts that tend to be fraudulent or deceptive, but are not successful. Rule 10b-5(c) prohibits "any act, practice, or course of business which operates *or would operate* as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (Emphasis added). Thus, when the SEC brings an enforcement action for

---

[7] Geneva moved for judgment on the pleadings or summary judgment (paper 75) and Westbury joined that motion without offering any additional argument on behalf of the motion (paper 80).

securities fraud under the statutes or its own regulations it must plead and prove only that the defendant "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *McConville*, 465 F.3d at 786.[8]

Geneva also argues that "Plaintiff fails to provide any evidence whatsoever by the District of Columbia that they considered [Geneva] to have committed fraud." (Paper 75, at 3). In support of this argument, Geneva has introduced a report prepared by the Council of the District of Columbia, Committee on Education, Libraries, and Recreation examining the District of Columbia's transactions with Geneva relating to charter school financing. This argument and the Council report do not entitle Geneva or Westbury to summary judgment.[9] The SEC is not required to prove that the District of Columbia believed that it has been defrauded, *see McConville*, 465 F.3d at 786, and rule 10b-5

---

[8] The SEC argues in its response to the motion for judgment on the pleadings only that the allegations it has made and evidence it has advanced are sufficient to satisfy any requirement to plead and prove reliance or damages. This argument need not be addressed, however, because as the SEC argued in its memorandum of law supporting the motion for preliminary relief, the SEC need only plead and prove that Defendants made a material misstatement or omission with scienter in connection with the purchase or sale of a security.

[9] This argument must be addressed under the Fed.R.Civ.P. 56(c) standard for a motion for summary judgment because Geneva has introduced evidence outside the pleadings which the court has not excluded. *See* Fed.R.Civ.P. 12(b).

prohibits a covered misstatement or omission, even if it does not actually succeed in deceiving, if it "would operate as a fraud or deceit upon any person."   Furthermore, the SEC has introduced testimony and a declaration of Deborah A. Gist, the District of Columbia's State Education Officer, who indicates that the District of Columbia is an injured investor with respect to these transactions.   (Paper 30, Ex. 9, Gist Decl., at 2; paper 32, at 93).   Although Geneva contends that the views expressed in the Council report and the fact that the Office of the Chief Financial Officer has not made any allegations of fraud should control over Ms. Gist's declaration, the conflicting evidence constitutes a dispute of fact and is an additional reason to deny Geneva and Westbury's motion for summary judgment.

Finally, Geneva argues that the POM executed with the District of Columbia contains sufficient qualifying language that its statements as to the types of investments Geneva would invest in cannot be considered a material misstatement or omission.   This allegation would support only the entry of partial summary judgment because, as Geneva notes (paper 75, at 1-2), the SEC's allegations of securities fraud are based in part on alleged misrepresentations and omissions in the POM, but also on other alleged misrepresentations and omissions, including those alleged to have occurred in the subsequent collateral agreement.

In the POM, Geneva indicates that the proceeds of sales of certificates to the District of Columbia would be invested in specified assets:

> We intend to invest certain amounts of our offering proceed, as approved by the Buyer, primarily in the types of securities and other investments listed below. Except as specifically noted, we may invest our reserves in such investments without limitation. In addition, except as specifically noted, the limitations described below apply only at the time of investment. The assets that we hold are not subject to the limitations described below.

(Paper 2, Ex. 19, at 11). The POM then lists eight types of investments: U.S. Government Securities, U.S. Government Agency Securities, Bank Obligations, Commercial Paper and Other Corporate Debt ("that meet the criteria for investment by life insurance companies under the laws of the District of Columbia ('qualified corporations')"), Equipment Related Instruments, Municipal Securities, Preferred and Common Stock ("of qualified corporations"), and Real Estate and Investments Secured by Real Estate. (*Id*. at 11-13).

The POM also cautions that "[t]he occurrence of unforeseen events or changes in business conditions . . . could result in our applying the proceeds of this offering in a manner other than as described in the Memorandum. (*Id*. at 7). The POM also asserts that it does not constitute "legal, business, or tax advice" and encourages the District of Columbia to "consult your own attorney,

business adviser and tax adviser for legal, business and tax advice regarding an investment in the Investment Note." (*Id.* at 2-3). The asset limitation statements in the POM are sufficiently explicit, despite these qualifying statements, that a jury could conclude that a reasonable investor would rely on them. *See Longman*, 197 F.3d at 683. Geneva and Westbury are thus not entitled to judgment on the pleadings or summary judgment on this basis.

**V.   Violation of the Investment Advisers Act**

The SEC alleges that Westbury and Geneva violated section 206 (1)&(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6 (1)&(2), based on the same conduct that the SEC alleges constitutes securities fraud by Westbury and Geneva upon the District of Columbia. The SEC seeks preliminary injunctive relief based on these allegations, while Geneva and Westbury have moved for judgment on the pleadings or, in the alternative, summary judgment as to the Investment Advisers Act claims.

Section 206 provides that:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly-
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . .

15 U.S.C. § 80b-6(1)-(2).  Scienter is not required for a violation of section 206(2), but a showing of at least negligence is required.  *Sec. & Exch. Comm'n v. Moran*, 922 F.Supp. 867, 897 (S.D.N.Y. 1996); *c.f. Sec. & Exch. Comm'n v. Steadman*, 967 F.2d 636, 647 (D.C.Cir. 1992) (interpreting "transaction, practice, or course of business" language common to 15 U.S.C. § 80b-6(2)&(4) to require only negligence rather than scienter).

An investment advisor for purposes of the Investment Advisers Act is defined as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities".  15 U.S.C. § 80b-2(a)(11).  The SEC's position is that "[a] determination as to whether a person . . . is an investment adviser will depend upon whether such person: (1) Provides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; and (3) provides such services for compensation."  Applicability of the Investment Advisers Act, Investment Advisers Act Release No. 1092, 52 Fed. Reg. 38,400, 38,402 (Oct. 16, 1987).

## A.   Motion for Preliminary Injunction

The SEC moves for a preliminary injunction against future violations of the Investment Advisers Act, but the SEC has not demonstrated that Geneva or Westbury was an investment adviser under the definition provided in the Investment Advisers Act itself or the SEC's further guidance.  A preliminary injunction against future violations of the Investment Advisers Act, like a preliminary injunction against fraud, would substantially burden numerous transactions and go beyond preservation of the status quo. As discussed above, such an injunction therefore requires a substantial showing on the merits as to a past violation and the likelihood of future violations of the Investment Advisers Act. *See Unifund SAL*, 910 F.2d at 1041.

The SEC argues that Westbury and Geneva were investment advisors in their management of the District of Columbia's assets. Westbury and Geneva contend that they do not offer investment advice for compensation, but instead own and manage their own assets while paying a fixed interest rate to the District of Columbia.  There is some evidence that Westbury and Geneva may have given investment advice to the District of Columbia for a fee, but this evidence is insufficient to grant the SEC's motion for a preliminary injunction against future violations of the Investment Advisers Act.   Geneva and Westbury provided the District of Columbia with the POM and a bid proposal regarding the purchase of

certificates from Geneva, but this document explicitly disclaims offering advice and instructs the District of Columbia to seek its own advice in evaluating the desirability of the investment. (Paper 2, Ex. 2, at 2-3). Geneva also held some District of Columbia assets, (paper 2, Attachment 2, at 14), but there is insufficient evidence that it gave the District of Columbia advice about investment of these assets or that a fee was charged for this service to warrant a preliminary injunction. Westbury proposed an arrangement whereby Geneva would manage assets owned by the District of Columbia for a fee as a modification of the previous agreement between Geneva and the District of Columbia, (paper 2, Ex. 24), but there appears to be a factual dispute as to the effect of this proposal. Because the District of Columbia has requested the return of all of its assets, it is also unclear whether Geneva or Westbury would be likely to commit a future violation of the Investment Advisers Act. Therefore, the SEC has not made a sufficient showing on the merits as to past and likely future violations to justify a preliminary injunction based on the alleged violations of the Investment Advisers Act.

**B.  Motion for Judgment on the Pleadings or Summary Judgment**

Geneva and Westbury request judgment on the pleadings or, in the alternative, summary judgment as to the SEC's allegations under the Investment Advisers Act. Geneva makes only one argument that

is unique to the Investment Advisers Act claim, that it did not act as an investment adviser as defined under the act.

Geneva and Westbury are not entitled to judgment on the pleadings or summary judgment on this basis.  The SEC's complaint alleges that:

> . . . [I]n connection with his efforts to mollify the District, on October 28, 2005, Westbury wrote a letter purporting to restructure the arrangement between Geneva and the D.C. Dept of Banking, by which he claims to have, essentially, set off from the amounts the District invested with Geneva, the amounts borrowed by the District from Geneva for charter school loans, terminating the revolving line of credit.
>
> Under these new terms, Westbury advises that, effective October 1, 2005, the new fee structure for Geneva's management of the District's investments would be 1.5% of assets under management.

(Paper 1, at 15).   Such an arrangement would make Geneva and Westbury investment advisers, because they would be collecting a fee in exchange for managing the investment of assets owned by the District of Columbia.  *See* 15 U.S.C. § 80b-2(a)(11).  Based on the text of the letter Westbury wrote on behalf of Geneva, it is not clear whether the letter was effective unilaterally without the approval of the District of Columbia or whether that approval was later received.  (Paper 2, Ex. 24).  The SEC's allegations are sufficient to allege that Westbury and Geneva acted as investment advisers by providing services to manage assets owned by the District of Columbia, and the letter is sufficient to create a

39

material dispute of fact as to the nature of the relationship between Geneva and the District of Columbia.

The SEC's claims based on the Investment Advisers Act are based on the same factual allegations of fraud that form the basis of the claims under rule 10b(6), section 10(b), and section 17(a) discussed above. Therefore, Geneva's arguments as to why the SEC's pleadings and evidence of securities fraud are insufficient would also apply to these claims. Neither Geneva nor Westbury makes any argument that a different legal standard should apply to the fraud claims under the Investment Advisers Act. Therefore, for the same reasons discussed above, Geneva and Westbury are not entitled to either judgment on the pleadings or summary judgment as to these allegations. The SEC has pled and produced adequate evidence of material misstatements and omissions with the requisite mental state, which is negligence under the Investment Advisers Act, *see Moran*, 922 F.Supp. at 897, to create material questions of fact for trial.

## VI.  Other Preliminary Injunctive Relief

## A.  Order Freezing Assets

An order freezing assets is within a district court's power to enter relief designed to preserve the status quo and ensure the availability of final relief, but "must be supported by a showing of fraud, mismanagement, or other reason to believe that, absent

the freeze order, the assets would be depleted or otherwise become unavailable." *Kemp*, 940 F.2d at 114.

As discussed above in relation to the asset reserves of SBMCC and SBMIC, the SEC has made an adequate showing that these entities may not have sufficient assets to satisfy the demands of all investors.  The unaudited financial statements of both companies from December 31, 2005 indicate that as of that time both held reserves insufficient to satisfy the principal owed to all certificate holders.  (Paper 2, Ex. 1, at 1-2; paper 2, Ex. 2, at 4).  In addition, each company has reported losses in the past three years, and an SEC review indicates that most of the assets held by each do not qualify as reserve assets under federal law because they involve too much risk.  (Paper 2, Attachment 2, at 6, 9).  Geneva has supported SBMCC through significant investment over the past three years, (*id.* at 7) but may not be able to continue this investment because most of its assets reflect investments by the District of Columbia, (paper 2, Ex. 5, at 1, 3), which has demanded the return of all of its investments.

On balance, the SEC has made a significant showing that SBMCC and SBMIC were in violation of the reserve requirements of section 28 of the Investment Company Act of 1940, and that there would be irreparable harm to investors without an injunction because these companies would have insufficient assets to satisfy the demands of all investors.  Defendants will be restricted in their ability to

make timely payments as required by their face amount certificates, but any harm to Defendants from this restriction is outweighed by the harm that would be done to investors if assets prove insufficient to satisfy the demands of all investors. The interests of investors in obtaining timely payments will also be impaired. The interest of these investors in each getting at least a fair share of the remaining assets of SBMIC or SBMCC, however, outweigh their interest in rapid payment, and the public interest that contracts be honored is furthered by this preliminary relief. Restrictions on distribution or expenditure of the proceeds of asset sales are also justified by the irreparable harm to investors from such a distribution if the assets of SBMIC and SBMCC are insufficient to satisfy the demands of all investors.

As a result, Defendants will continue to be required to comply with all aspects of this court's April 4, 2006, and May 12, 2006 Orders. Defendants will also continue to seek leave of this court to sell any assets of SBMIC or SBMCC, and will seek leave of this court to distribute the proceeds of the sale of any assets of SBMIC or SBMCC to investors or otherwise.

SBMCC and SBMIC have filed two motions seeking permission to sell specific assets to take advantage of appreciation in the value of these assets. SBMCC filed a motion (paper 57) on October 24, 2006, to sell a tax certificate, and SBMIC filed a motion (paper 58) on October 27, 2006, to sell corporate bonds issues by General

Motors and Calpine Corporation. SBMCC also renewed and supplemented its motion to sell the tax certificate on January 9, 2007, stressing that a buyer for the tax certificate has been found, and had relied upon SBMCC's past representation that the tax certificate would be sold. (Paper 77). The SEC responded to these motions jointly, and opposed the proposed sales because they contain no "assurance that the proceeds . . . will be used to purchase qualified assets." (Paper 60, at 1). Defendants rejected a sale subject to such controls, indicating that the proposed sales are "for the benefit of the respective SBM Company, and indirectly benefit[] the security of the shareholders." (Paper 72, at 2).

Allowing SBMIC and SBMCC to sell assets without safeguards to ensure that the sales would not further deplete their qualified asset reserves would contravene the reasoning and purpose underlying the asset freeze that was previously ordered by the court and that will be reaffirmed in the accompanying Order. Any harm Defendants or investors may suffer as a result of the inability to sell these assets at this time is outweighed by the irreparable harm some investors will suffer if no assets remain when the time comes for repayment of their investments.

The SEC has also requested an order freezing the assets of Geneva, but such an order is not warranted. As discussed above, the SEC has not established a sufficiently strong case as to its

fraud-based allegations against Geneva to support preliminary injunctive relief.

**B.   Appointment of a Receiver and Requirement of an Accounting**

SEC requests appointment of a receiver to provide an accurate accounting of Defendants' affairs or to run the entity-Defendants and bring them into compliance with the law.   Appointment of a trustee to dispose of a defendant's assets is authorized by section 42(d) of the Investment Company Act of 1940, 15 U.S.C. § 80a-41(d), "to the extent [a court of equity] deems necessary or appropriate." Furthermore, "[t]he federal securities statutes confer upon district courts broad equitable powers to fashion appropriate remedies, including the appointment of a receiver, to effectuate the purposes of the securities laws." *Terry v. June*, 359 F.Supp.2d 510, 519 (W.D.Va. 2005) (citing *Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103-05 (2$^d$ Cir. 1972)), *amended on other grounds by* 420 F.Supp.2d 493 (W.D.Va. 2006).

Under the circumstances of this case, appointment of a receiver to provide an accounting of Defendants' affairs is not necessary to preserve the status quo.   While Defendants' past misstatements as to the nature of the charter school loan transactions are troubling, Defendants responded to this court's May 12, 2006 Order by producing the required documents that establish the facts of these transactions.   Appointment of a receiver would entail substantial cost and probably significant

44

delay of this proceeding, and these costs outweigh any benefit that
would be gained from independent investigation of Defendants'
affairs.   The discovery powers available to the SEC should be
sufficient to produce accurate evidence of Defendants' financial
affairs.  If discovery proves inadequate in some way in the future,
the SEC can move for appropriate relief at that time.   There is no
evidence that irreparable harm will result from allowing Defendants
to continue their own management of their affairs subject to this
court's Orders without the imposition of a receiver to manage those
affairs.    Therefore the SEC's motion to appoint a receiver and
require a full accounting will be denied.

## C.  Other Equitable relief

The SEC also seeks a preliminary injunction against the
destruction of any evidence, expedited discovery, a temporary
restraining order, and an order providing alternative means of
service.  The SEC offers no evidence that Defendants have destroyed
evidence or would do so without an injunction.  As a result, there
is nothing to suggest that such an injunction is necessary to
maintain the status quo, and the SEC's request to enjoin
destruction of evidence will be denied.   The SEC's motion for
expedited discovery will be denied as moot because the time for
discovery under this court's July 13, 2006 Scheduling Order has
already commenced.   The SEC's motion for a temporary restraining
order will also be denied as moot, because the court will now rule

on the SEC's motion for a preliminary injunction.  The SEC's motion for alternative means of service will be denied because Defendants have already been served with the complaint and alternative means of service of litigation documents on Defendants' counsel is unnecessary.

## VII.  Scheduling Order

The SEC also moves (paper 41) to amend the July 13, 2006 Scheduling Order, (paper 35).  The SEC argues that the Scheduling Order is inefficient because it requires initial expert discovery before the close of fact discovery.  The SEC suggests a scheduling order that would establish expert discovery deadlines after the close of discovery, currently scheduled for November 27, 2006.  It suggests an amended schedule of deadlines delayed from a later fact-discovery deadline.  The SEC also argues that it would be more efficient to conduct expert discovery with the benefit of this court's ruling on its motion for preliminary relief.

Pursuant to Fed.R.Civ.P. 16(b), a scheduling order may be modified only "upon a showing of good cause."   A scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge[.]"  Fed.R.Civ.P. 16(b).  Indeed, the Scheduling Order issued on July 13 specifically provided that it "will not be changed except for good cause."  (Paper 35).

The primary consideration of the Rule 16(b) "good cause" standard is the diligence of the movant.  Lack of diligence and

46

carelessness are "hallmarks of failure to meet the good cause standard." *W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va. 2000). "[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. *If that party was not diligent, the inquiry should end.*" *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995) (emphasis in original).

The SEC asserts that conducting fact discovery and expert discovery in this case simultaneously would be inefficient, because it would require significant revisions of expert reports in response to later-discovered facts.[10]  This inefficiency is adequate cause to amend the Scheduling Order.  The SEC has been adequately diligent despite ultimately failing to file its initial expert disclosures by the deadline set in the Scheduling Order because its motion was filed on August 15, 2006, before expert disclosures were due.  Defendants, however, have a strong interest in the rapid resolution of this case, because of the significant restrictions imposed on Defendants' business operations at the SEC's request. As a result, the Scheduling Order will be amended with a view toward minimizing the delay in the prompt resolution of the case, and a teleconference to establish such a schedule will be set.

---

[10] The SEC cites significant authority for the proposition that complex litigation often is conducted with expert discovery delayed until after some or all fact discovery is completed. *See, e.g., Manual for Complex Litigation*, § 11.481 at 98 (4th ed. 2004).

## VIII.  Motion for Protective Order

The SEC has requested a protective order, pursuant to Fed.R.Civ.P. 26(c), to quash a deposition noticed by Westbury, on the ground that only an attorney or an individual working under an attorney could be designated, and that such a deposition would violate the protection afforded to attorney work product.  Westbury noticed a deposition pursuant to Fed.R.Civ.P. 30(b)(6), requiring the SEC to designate and prepare a witness to be deposed as to ten topics named in the deposition notice.  (Paper 83, Ex. 1).  The topics designated for the deposition are:

> 1.  All communications with Westbury, or any agents acting on Westbury's behalf, concerning John Lawbaugh's management of 1st Atlantic Guaranty Corp., SMB Certificate Company and/or any related companies.
> 2.  All communications with Westbury, or any agents acting on Westbury's behalf, concerning Westbury's and/or Geneva Capital Partners, LLC's proposed purchase of 1st Atlantic Guaranty Corp., SBM Certificate Company and/or any related companies from John Lawbaugh's bankruptcy estate.
> 3.  All communications to Judge Maness [sic, Mannes] of the United States Bankruptcy Court for the District of Maryland, Greenbelt Division, concerning the SEC's position with respect to Westbury's and/or Geneva Capital Partners, LLC's proposed purchase of 1st Atlantic Guaranty Corp., SBM Certificate Company and/or any related companies from John Lawbaugh's bankruptcy estate.
> 4.  All communications with Westbury, or any agents acting on his behalf, concerning the reserve methodology being used and/or to be used for face amount certificates by SBM Certificate Company, SBM Investment Certificates, Inc. and/or any related companies.

48

5.   All positions taken by the SEC with respect to reserve requirements for face amount certificate companies from April 2001 through April 2006.

6.   All communications with Westbury, or any agents acting on his behalf, concerning business transacted between Geneva Capital Partners, LLC and the District of Columbia.

7.   All communications with any representatives of, or any agents acting on behalf of, the District of Columbia concerning Westbury.

8.   All communications with any representatives of, or agents acting on behalf of, the District of Columbia concerning business transacted between Geneva Capital Partners, LLC and the District of Columbia.

9.   All communications with any representative of the United States Department of Education, the Federal Bureau of Investigation or the United States Attorney's Office for the District of Columbia concerning Westbury, Geneva Capital Partners, LLC and/or any related companies.

10.  The factual bases, if any, for the allegations made against Westbury in the SEC's Complaint in the case.

*(Id.).*

The general standard for discovery, as set forth in Fed.R.Civ.P. 26, is relatively broad:

Rule 26 governs discovery entitlement and provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ."  Fed.R.Civ.P. 26(b)(1). While the Federal Rules of Civil Procedure do not define relevance, the Federal Rules of Evidence do, as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Or, as rephrased in the commentary, "[d]oes the item

49

> of evidence tend to prove the matter sought to
> be proved?"

*United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 409

(D.Md. 2005) (footnote omitted).   Fed.R.Civ.P. 30(b)(6), under

which Westbury noticed the disputed deposition, provides parties

with the ability to effectively depose an entity regarding matters

that are within its knowledge.   It provides that:

> A party may in the party's notice and in a
> subpoena name as the deponent a public or
> private corporation or a partnership or
> association or governmental agency and
> describe with reasonable particularity the
> matters on which examination is requested.  In
> that event, the organization so named shall
> designate one or more officers, directors, or
> managing agents, or other persons who consent
> to testify on its behalf, and may set forth,
> for each person designated, the matters on
> which the person will testify.   A subpoena
> shall advise a non-party organization of its
> duty to make such a designation.   The persons
> so designated shall testify as to matters
> known or reasonably available to the
> organization.

The Fourth Circuit has explained that discovery requests may,

however, be limited:

> On its own initiative or in response to a
> motion for protective order under Rule 26(c),
> a district court may limit "the frequency or
> extent of use of the discovery methods
> otherwise permitted" under the Federal Rules
> of Civil Procedure if it concludes that "(I)
> the discovery sought is unreasonably
> cumulative or duplicative, or is obtainable
> from some other source that is more
> convenient, less burdensome, or less
> expensive; (ii) the party seeking discovery
> has had ample opportunity by discovery in the
> action to obtain the information sought; or

> (iii) the burden or expense of the proposed
> discovery outweighs its likely benefit."
> Fed.R.Civ.P. 26(b)(2). Further, upon motion
> of a party and "for good cause shown," the
> court [in which the action is pending or, on
> matters relating to a deposition,] in the
> district in which a deposition is to be taken
> may "make any order which justice requires to
> protect a party or person from annoyance,
> embarrassment, oppression, or undue burden or
> expense," including an order that the
> discovery not be had. Fed.R.Civ.P. 26(c).

*Nicholas v. Wyndham Int'l., Inc.*, 373 F.3d 537, 543 (4th Cir. 2004).

With regard to discovery of materials created in preparation for litigation, Fed.R.Civ.P. 26(b)(3) provides protection for these materials and especially for attorney work product:

> [A] party may obtain discovery of documents
> and tangible things otherwise discoverable . .
> . and prepared in anticipation of litigation
> or for trial . . . only upon a showing that
> the party seeking discovery has substantial
> need of the materials in the preparation of
> the party's case and that the party is unable
> without undue hardship to obtain the
> substantial equivalent of the materials by
> other means. In ordering discovery of such
> materials when the required showing has been
> made, *the court shall protect against
> disclosure of the mental impressions,
> conclusions, opinions, or legal theories of an
> attorney or other representative of a party
> concerning the litigation.*

(Emphasis added). The Fourth Circuit has held that "opinion work product material, as distinguished from material not containing mental impressions, conclusions, opinions, or legal theories, is immune from discovery although the litigation in which it was developed has been terminated." *Duplan Corp. v. Moulinage et*

51

*Retorderie de Chavanoz*, 509 F.2d 730, 732 (4th Cir. 1974), *cert. denied*, 420 U.S. 997 (1975).

A motion for a protective order and to quash a deposition noticed pursuant to Fed.R.Civ.P. 30(b)(6) against the SEC concerning its investigation of a defendant was considered in *Securities & Exchange Commission v. Rosenfeld*, No. 97-CIV-1467, 1997 WL 576021 (S.D.N.Y. Sept. 16, 1997). The *Rosenfeld* court granted the protective order and quashed the deposition notice, reasoning that:

> the notice of deposition clearly calls for the revealing of information gathered by the SEC attorneys in anticipation of bringing the instant enforcement proceedings, and if forced to designate witnesses to testify fully and completely concerning the matters described in the notice of deposition, testimony of SEC attorneys or examiners working under the direction of the SEC attorneys conducting the investigation would be necessary. . . . Thus the witness designated would have to have been prepared by those who conducted the investigation and, since the investigation was conducted by the SEC attorneys, preparation of the witnesses would include disclosure of the SEC attorneys' legal and factual theories as regards the alleged violations of the security laws of this country and their opinions as to the significance of documents, credibility of witnesses, and other matters constituting attorney work product.

*Id.* at *2-3. The court gave particular emphasis to the fact that the SEC is a law enforcement agency, and the deposition sought by the defendant would have involved inquiry into the law enforcement investigation conducted by the SEC's legal staff. *Id.* at *2. The

*Rosenfeld* court also considered it significant that the defendant had not attempted to use other means of discovery, such as interrogatories or requests for documents, and had also not demonstrated how he would be prejudiced by being required to use these discovery tools instead of the noticed deposition. *Id.* at *3-4. The court concluded that it should grant the SEC's motion because:

> to proceed by way of the Rule 30(b)(6) deposition sought by defendant Rosenfeld would undoubtedly place an undue burden on the SEC and the court, which would have to make a multitude of otherwise unnecessary decisions about issues of attorney work product and law enforcement privilege, whereas no prejudice to defendant Rosenfeld has been shown if he is required to conduct discovery by the other methods suggested in this opinion.

*Id.* at *4.

In this case, the SEC asserts that "[b]ecause the Commission is a law enforcement agency with no independent knowledge of wrongdoing at issue, it cannot designate a fact witness to testify about those events" and would have "to designate a person familiar with the investigative record, which would necessarily be a Commission attorney who is part of the Commission's litigation team." (Paper 61, at 6). The SEC also acknowledges that other avenues are available to Westbury to acquire the information underlying the SEC's investigation, including deposition of fact witnesses, identification of fact witnesses through interrogatories, and requests for production of documents

discovered through the investigation from the SEC.   (Paper 61, at 10, 12).

The reasoning expressed in *Rosenfeld* is persuasive, and applies with equal force to this case, which presents a nearly-identical factual situation.   The ten areas of inquiry for the deposition noticed by Westbury would require preparation of a witness with opinion work product under the rationale of *Rosenfeld*. Topics one through three (paper 83, Ex. 1, at 1-2) relate to the SEC's investigation of SBMCC and SBMIC in relation to the Lawbaugh case, and would require the investigating attorneys' thought processes and opinions.   Opinion work product remains privileged even when the litigation it was prepared for has ended, especially as here where the same parties are again involved in litigation over related matters.   *See Duplan Corp.*, 509 F.2d at 732.   Topics seven through ten directly seek the results of the SEC's present investigation, and would require disclosure of the opinions, strategy, and "would inevitably tend to disclose the investigating attorneys' preliminary positions and legal theories concerning the suspected conduct of defendant[s] . . . and those factual areas which were of particular interest to the SEC investigators . . . ." *Rosenfeld*, 1997 WL 576021 at *4.   Topics four and six likewise concern this investigation, and also concern communications made to Westbury or his agents, which he should be aware of through means other than the noticed deposition.   Topic five implicates the SEC's

investigation both in this case and in other cases, but would at least require disclosure of the details of the investigation, and thus implicates opinion work product in the same manner as topics six through ten. Furthermore, the information Westbury seeks through topic five may be available by way of a request for documents or interrogatory.

Westbury argues that the SEC could designate a witness other than an investigating attorney, such as Andrea Dittert, the SEC's Supervisory Staff Accountant for this case. A similar argument was raised by the defendant in *Rosenfeld*, and the *Rosenfeld* court's analysis on the point is persuasive. The designated witness would have to be fully and completely prepared by the investigating attorneys to discuss the noticed topics, *see* Fed.R.Civ.P. 30(b)(6), including the attorney's opinion work product, and in addition, an SEC examiner like Ms. Dittert works under the supervision of the SEC's investigating attorneys, and may already be familiar with such opinion work product. *See Rosenfeld*, 1997 WL 576021 at *2-3. Thus, attorney work product would inevitably be revealed if she were designated for the deposition for the same reasons that it would necessarily be revealed if an SEC investigating attorney were designated.

Westbury also argues that a protective order totally preventing a Rule 30(b)(6) deposition is inappropriate in a case where factual questions will be tried, relying on the analysis in

*In re Bilzerian*, 258 B.R. 846 (Bankr.M.D.Fla. 2001).  In that case, the SEC sought and received a protective order to prevent a Rule 30(b)(6) deposition that would have required designation of one of the SEC's investigating attorneys.  *Id.* at 849-50.  The *Bilzerian* court stated that its conclusion was

> predicated on the position of the SEC that it is entitled to the relief requested as a matter of law based on a factual record totally supported by facts that have been conclusively established by other courts or statements of Bilzerian contained in court filings.  The court will limit the record for purposes of the hearing on the Motion to Dismiss to be held on February 8, to such matters."

*Id.* at 849.  The *Rosenfeld* court, however, did not impose such a caveat when it quashed a Rule 30(b)(6) deposition of the SEC, finding that other means of discovery available to the defendant weighed in favor of granting a protective order.  *Rosenfeld*, 1997 WL 576021 at *3-4.  Given the other means of discovery available to Westbury and the degree to which the designated topics would intrude upon the opinion work product of the SEC investigating attorneys, a protective order is warranted in this case in spite of the fact that factual discovery has been available to and utilized by the SEC in this case.

Westbury argues that the court should follow the reasoning of *Wilson v. Lakner*, 228 F.R.D. 524 (D.Md. 2005) to deny the protective order, but that reasoning does not support Westbury's position under the facts of this case.  In *Wilson*, a plaintiff in

56

a medical malpractice action sought a Rule 30(b)(6) deposition of the treating hospital regarding the circumstances of the plaintiff's treatment.  The hospital objected to the deposition on the ground that the only investigation of these facts it had conducted was privileged under a Maryland statute.  The court reasoned that the hospital, as an entity, had knowledge of what happened during treatment and what hospital records showed independent from any subsequent, privileged, investigation. *Id.* at 529.  Thus, the fact that preparing a witness to testify would require investigating the same subject matter as the privileged investigation did not preclude the deposition.  *Id.*  The *Wilson* court held, however, that the results of the hospital's investigation themselves were not discoverable.  *Id.*  The factual situation presented by Westbury's deposition notice is distinct from that in *Wilson*, and is instead analogous to *Rosenfeld*.  The SEC, a law enforcement agency, unlike the hospital in *Wilson*, has no independent knowledge of Defendants' financial affairs.  Therefore, only the results of the SEC's investigation could be inquired into in a Rule 30(b)(6) deposition, and such inquiry would inevitably and improperly invade the work product of SEC investigating attorneys, as discussed above.

Finally, Westbury argues that a protective order and an order quashing the deposition notice are the incorrect procedure to protect the SEC's attorney work product, and that the deposition

should go forward to allow for objections to individual questions on the basis that the answer would reveal work product.  This argument was considered and persuasively rejected in *N.F.A. Corp. v. Riverview Narrow Fabrics, Inc.*, 117 F.R.D. 83 (M.D.N.C. 1987). The *N.F.A.* court reasoned that, although there is a general rule against granting a motion totally to prohibit a deposition, such an extraordinary result is warranted when a party seeks to depose another party's attorney:

> Because deposition of a party's attorney is usually both burdensome and disruptive, the mere request to depose a party's attorney constitutes good cause for obtaining a Rule 26(c), Fed.R.Civ.P., protective order unless the party seeking the deposition can show both the propriety and need for the deposition. This procedure is superior to requiring the attorney to submit to a deposition and make his objections at that time.  Sometimes there are very legitimate reasons for deposing a party's attorney.  More often deposition of the attorney merely embroils the parties and the court in controversies over the attorney-client privilege and more importantly, involves forays into the area most protected by the work product doctrine--that involving an attorney's mental impressions or opinions.

*N.F.A.*, 117 F.R.D. at 85 (footnotes omitted) (citing *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986)).  For the same reasons, Westbury's deposition notice will be quashed and the SEC's motion for a protective order will be granted.  Westbury has other means of discovery available to procure much of the information he seeks through the disputed deposition, and the

burden on the court and the SEC in considering the work product issue as to an inevitable array of issues raised at the deposition are not warranted.

## IX.  Conclusion

For the reasons set forth above, the motion of the SEC for preliminary injunctive relief will be granted in part and denied in part.  The motion of the SEC to modify the July 13, 2006 Scheduling Order will be granted and an amended scheduling order will be established at a scheduling teleconference.  The SEC's motion for a protective order will also be granted.  The motions of SBMIC and SBMCC to sell specified assets will be denied, and the motion of Geneva and Westbury for judgment on the pleadings or summary judgment will also be denied.  A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge