IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
                                    :
SECURITIES AND EXCHANGE
COMMISSION                          :

    v.                              :   Civil Action No. DKC 06-0866

                                    :

SBM INVESTMENT CERTIFICATES,
INC., et al.                        :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action is a motion filed by Plaintiff Securities and Exchange Commission ("SEC") seeking to hold Defendants SBM Investment Certificates, Inc. ("SBMIC") and SBM Certificate Company ("SBMCC") (collectively, "the SBM companies" or "the companies") in contempt of court and for expedited discovery in advance of a September 13, 2011, hearing (ECF No. 234), and four motions filed by the SBM companies: (1) a motion to stay partially the final consent judgment ("FCJ") (ECF No. 222), (2) a "second motion" for limited relief from the FCJ (ECF No. 225), (3) a motion to extend the time to file an opposition to the SEC's contempt motion (ECF No. 239), and (4) a motion to stay the evidentiary portion of the October 17, 2011, contempt hearing pending the court's construction of the plain language of the

FCJ (ECF No. 249).[1]  The issues are fully briefed, and, following hearings on September 13, October 17, November 18, and November 30, 2011, the court now rules.  For the reasons that follow, the SBM companies will be held in civil contempt, and the SEC's motion will thus be granted in part.  A hearing will be scheduled to determine the proper remedy for the companies' contempt.  The portion of the motion seeking expedited discovery was previously resolved by the parties and will, therefore, be denied as moot.  The SBM companies' motion to extend the time to file an opposition to the contempt motion will be granted, while the remaining motions will be denied as moot.

## I.  Background

Because many of the facts underlying this suit have been recounted elsewhere, *see, e.g.*, *SEC v. SBM Inv. Certificates, Inc.*, No. DKC 2006-0866, 2007 WL 609888 (D.Md. Feb. 23, 2007), only a brief recitation of the facts relevant to the pending motion is necessary here.

Following extensive negotiations, the SEC and the SBM companies entered into the FCJ to settle this action, which the SEC had brought to obtain relief from the companies' purported violation of numerous securities laws, including Section 28 of

---

[1] Also pending is a renewed motion by Melvin White, counsel for the SBM companies, to withdraw.  (ECF No. 250).  That motion will be resolved by separate memorandum opinion and order.

the Investment Company Act of 1940 ("Section 28"). The court approved and entered the FCJ on February 28, 2011. (ECF No. 214). Pursuant to the FCJ, the SBM companies agreed to the following provisions: (1) to retain Laurence Friend, C.P.A., an Independent Consultant who would provide comprehensive review and reporting functions, within thirty days; (2) to submit monthly reports to the SEC regarding the companies' steps toward compliance with Section 28; (3) to place all funds from the sale of any assets into an escrow account for the benefit of certificate holders; and (4) to file SBMCC's annual reports for calendar years 2007, 2008, 2009, and 2010 with the SEC within 180 days.

Shortly after the court entered the FCJ, Friend informed Eric Westbury, the Chairman and CEO of the SBM companies, that he would not begin any consulting work under the FCJ until the companies had set aside $500,000 to fund that work.[2]  On March 21, 2011, Westbury informed Friend via e-mail that the SBM companies could not yet commit to providing a set aside of that amount because they lacked the necessary funding. The e-mail further indicated that the companies were attempting to obtain

---

[2]  Subsequent correspondence between Friend and Westbury indicates that Friend's reluctance may have stemmed from the fact that the SBM companies had not paid Friend more than $80,000 that he had earned during a prior engagement. (Def.'s Hr'g Ex. 7, at SBM-MWHITE 2333).

these funds through monetization of an asset held by the Bank of New York Mellon or through a personal loan to Westbury.[3]   On March 30, 2011, the SBM companies requested a twenty-one day extension of the FCJ's terms to fund the set-aside and "finalize . . . Friend's retention."  (ECF No. 219, at 6).  The court granted this request.

Having received only a recurring interest payment of approximately $6,000 by mid-April, however, the companies requested an additional ten-day extension to gather funds on April 20, 2011.  (ECF No. 222).  On May 2, 2011, the SEC opposed this motion.   Four days later, after receiving the next recurring interest payment – this time totaling roughly $7,700, the SBM companies filed a motion seeking to extend the time to hire Friend until June 15, 2011.   (ECF No. 225).   In a declaration attached to the motion, Westbury identified four funding sources for the $500,000 set-aside that the companies expected to receive no later than June 15, 2011.[4]  The SEC also opposed this motion, noting that the SBM companies had failed to "explain the good faith efforts [they had taken] to ascertain whether Mr. Friend would begin work at a minimal funding level." (ECF No. 226, at 5).

_____

[3] Westbury later testified that neither of these efforts proved fruitful.

[4] Funding from these sources apparently never materialized.

On May 24, 2011, Westbury again contacted Friend. He requested that Friend begin the work specified in the FCJ and that the parties enter into a payment schedule whereby the companies would pay Friend $100,000 within six months. Friend rejected this proposition and made a counteroffer the following day. Friend proposed to "change the arrangement" such that the SBM companies would provide a $150,000 "Evergreen Retainer" that "would be replenished as necessary to maintain a balance of at least $100,000." (Def.'s Hr'g Ex. 7, at SBM-MWHITE 2333). Although Friend welcomed Westbury's "thoughts" on the proposal (*id.*), Westbury never responded to this letter.

Near the end of June, SBMCC received a check for approximately $6,300 from U.S. Bank related to "the sale of a Ginnie Mae," one of the company's assets. (Contempt Mot. Hr'g Tr. 56, Nov. 18, 2011).[5] Westbury did not set these funds aside for certificate holders. Around this time, Westbury also learned that a county tax sale of collateral in Texas that secured one of SBMCC's assets had generated excess proceeds of nearly $67,000. Westbury did not set these funds aside or offer to use them to fund Friend's work. Rather, on June 29, 2011, in

---

[5] U.S. Bank contacted SBMCC about liquidating this asset in order to collect approximately $6,000 in unpaid fees. The company agreed to the sale, and U.S. Bank then sold the asset for more than $12,000. Because the bank removed the unpaid fees prior to paying SBMCC, it only received proceeds of approximately $6,300 from the asset liquidation.

a joint status report, the SBM companies acknowledged their non-compliance with numerous terms of the FCJ, including retention of Friend, and asserted that "they [were] financially unable to meet the outstanding obligations in the FCJ" and would deregister as "investment companies." (ECF No. 228, at 3-6). Westbury subsequently used approximately $37,000 of these funds to pay for his children's school tuition.[6]

On August 24, 2011, the SEC filed a motion to hold the SBM companies in contempt of court and to obtain expedited discovery in advance of a hearing previously scheduled for September 13, 2011. During a telephone conference with the court on August 30, 2011, the SBM companies agreed to provide the discovery sought by the SEC prior to the hearing.[7] The SBM companies moved to extend the time to file an opposition to the SEC's motion on September 10, 2011,[8] and ultimately filed their opposition later that day.

---

[6] Westbury asserted that he obtained these funds through the companies' repayment of a loan to one of their holding companies. No evidence was ever offered to substantiate this assertion.

[7] Around this time, the SBM companies received another recurring interest payment of approximately $7,800. Once again, none of this money was set aside to fund Friend's work.

[8] Local Rule 105.2(a) requires "all memoranda in opposition to a motion [to] be filed within fourteen (14) days of service of the motion." The SEC filed its motion to hold the SBM companies in contempt on August 24, 2011, and the companies' opposition was, therefore, due by September 7, 2011. Despite

At the September 13, 2011, hearing, the parties presented legal argument regarding the merits of the contempt motion. The SBM companies emphasized, as they had in the June 29, 2011, status report, that they planned to seek deregistration in the immediate future. In response, the SEC proposed that the SBM companies hire Friend "in the interim" to begin performing certain limited duties set forth in the FCJ. (Contempt Mot. Hr'g Tr. 8, Sept. 13, 2011).[9] Both parties then agreed to contact Friend and request that he commence this "prioritized" work with a set-aside of $50,000. (Def.'s Hr'g Ex. 9). The companies further agreed "not . . . to expend any funds they receive[d]" until this payment had been made. (Contempt Mot. Hr'g Tr. 30-31, Sept. 13, 2011).

By mid-October, however, the SBM companies had only provided approximately $7,100, the net proceeds from the September interest payment, to fund Friend's preliminary work. A second hearing was scheduled for October 17, 2011, to address the pending contempt motion. On October 12, 2011, the SBM companies moved to stay the evidentiary portion of that hearing "pending the court's construction" of the FCJ, which they

the untimely filing of their motion to extend, the companies' request will be granted. Accordingly, their opposition will be considered in evaluating the merits of the SEC's motion.

   [9] The parties agreed that the SBM companies would not need to retain Friend to comply with the FCJ if the companies actually completed the deregistration process. (*Id.*).

contended was "plain and unambiguous" in permitting them to comply with the FCJ without engaging Friend once they had elected to seek deregistration. (ECF No. 249-1, at 2). The court held the previously scheduled hearing on October 17, 2011, to address the parties' legal arguments on this issue.[10]

Evidentiary hearings on the contempt motion were held on November 18 and November 30, 2011. Both parties presented testimony from Westbury and Phillip Hayden, the Chief Compliance Officer for the SBM companies. They acknowledged that the companies had "not taken any steps to de-register" and that funds subsequently received had not been used to fund Friend's work. (Contempt Mot. Hr'g Tr. 16, Oct. 17, 2011; Contempt Mot. Hr'g Tr. 100, Nov. 18, 2011).[11] They also admitted that the companies had not submitted any monthly or annual reports to the SEC.

## II. Motion to Hold the SBM Companies in Contempt

The SEC has moved to hold the SBM companies in contempt for failing to abide by numerous provisions of the FCJ. The SBM companies oppose this motion on two grounds. First, they contend that the SEC has failed set forth a *prima facie* case for

---

[10] The companies' motion to stay the evidentiary portion of that hearing will be denied as moot.

[11] Westbury testified that these funds were instead used to pay rent and a storage bill. No receipts were provided to substantiate these payments.

civil contempt.   Second, assuming *arguendo* that the SEC has made this showing, the SBM companies contend they are financially unable to comply with the FCJ, despite their diligent efforts to do so, and that this defense precludes a finding of contempt. These arguments will be addressed in turn.

**A.   Whether the SEC Has Set Forth a *Prima Facie* Case for Civil Contempt**

To establish civil contempt, the SEC must prove the following four elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) ... that the decree was in the movant's 'favor'; (3) ... that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive) of such violations; and (4) ... that [the] movant suffered harm as a result.

*JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) (*quoting Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)) (internal citations omitted) (ellipses in original). Based on the evidence presented at the hearings on this motion, the SEC has proven these four elements and has, therefore, set forth a *prima facie* case for civil contempt.

**1.   Knowledge of a Valid Decree**

The SEC contends that the SBM companies knew of the FCJ, and that the FCJ constitutes a valid judicial decree.   Consent

judgments do constitute judicial decrees for purposes of contempt proceedings. *See Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co.*, 744 F.Supp.2d 561, 566 (S.D.W.Va. 2010) (holding a defendant in contempt for violation of a consent decree); *Colonial Williamsburg Found. v. Kittinger Co.*, 792 F.Supp. 1397, 1406 (E.D.Va. 1992) (same), *aff'd*, 38 F.3d 133 (4th Cir. 1994); *see also Spallone v. United States*, 493 U.S. 265, 276 (1990) (reasoning that civil contempt is an appropriate method to enforce a consent judgment). In their post-hearing brief, however, the SBM companies suggest that the FCJ does not constitute a valid decree. Specifically, they argue that the FCJ violates Federal Rule of Civil Procedure 65(d)(1)(C) because it references a retainer contract involving Friend as well as Section 28 and the Insurance Code for the District of Columbia.[12] This argument is without merit.

As an initial matter, the SBM companies waived any defense based on Rule 65(d) when they executed the Consent appended to the FCJ. (*See* ECF No. 214-1 ¶ 11) ("Defendants will not oppose the enforcement of the [FCJ] on the ground . . . that it fails to comply with Rule 65(d) of the Federal Rules of Civil

---

[12] Rule 65(d)(1)(C) requires "[e]very order granting an injunction . . . [to] describe in reasonable detail – and not by referring to . . . [an]other document – the act or acts restrained or required."

Procedure, and hereby waive any objection based thereon."). Yet even assuming that this defense had not been waived and that these brief references did violate Rule 65(d),[13] the FCJ would remain a valid judicial decree. Although the terms of Rule 65 "are mandatory and must be observed in every instance," *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967), the United States Court of Appeals for the Fourth Circuit has emphasized that a court order may not be avoided on purely "technical grounds," *United States v. Fuller*, 919 F.2d 139, at *3 (4th Cir. 1990) (unpublished opinion). Permitting the companies' Rule 65(d) argument to succeed, however, would have precisely that effect.

Rule 65(d) serves to prevent "uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The SBM companies wholly fail to articulate how brief

---

[13] At least with regard to the reference to the retainer contract in section I(a)(i) of the FCJ, no violation of Rule 65(d) has occurred. Section I of the FCJ explains, in significant detail, each of the acts that the SBM companies – through Friend - must perform in order to satisfy the FCJ. It does not rely on the retainer contract to set forth any of these duties. Indeed, a review of a March 2010 retainer contract, which Westbury testified "look[ed] like" the January 4, 2010, retainer contract (ECF No. 273, at 3), reveals that this contract was merely a private agreement between the companies and Friend that described the expected terms of their relationship during Friend's engagement as Independent Consultant.

references to three external sources would render the FCJ - an agreement that the parties reached following extensive negotiation and drafting - uncertain and confusing.   Indeed, beyond a conclusory assertion that these references create ambiguity, the companies provide no support for this contention. Their Rule 65(d) argument thus appears to be merely a last-ditch attempt to avoid the FCJ's requirements on "technical grounds." *Fuller*, 919 F.2d 139, at *3.    Faced with analogous circumstances, courts in this circuit have previously refused to preclude a contempt finding on such grounds. *See SEC v. Dowdell*, No. Civ.A. 301CV00116, 2002 WL 31248028, at *3 (W.D.Va. Sept. 30, 2002) (finding a court order valid for purposes of a contempt proceeding even though the order repeatedly referenced the complaint); *cf. United States v. McAndrew*, 480 F.Supp. 1189, 1192 (E.D.Va. 1979) (rejecting the defendants' argument that a Rule 65(d) violation precluded a criminal contempt finding where the defendants had "intimate familiarity with the terms of the order and consent decree" because they had "participated in the negotiations and drafting process").    A similar outcome is warranted in the present case.[14]    The FCJ, despite its brief references to outside sources, remains a valid judicial decree.

---

[14] The companies' citation to *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11 (1st Cir. 1991), does not alter this conclusion.   In *Project B.A.S.I.C.*, the court cited Rule 65(d) when reasoning

Finally, the SBM companies do not deny that they had actual knowledge of the FCJ.   Indeed, they could not, as they were extensively involved in its negotiation and drafting.   Westbury also signed the attached Consent, waiving service of the FCJ and acknowledging that its entry constituted notice to the SBM companies of its terms and conditions.   *See Eyeticket Corp. v. Iridian Techs., Inc.*, No. 1:00CV699, 2005 WL 2334683, at *3 (E.D.Va. Sept. 23, 2005) (finding that a defendant corporation "clearly had actual knowledge" of a consent order and noting that its executives had signed a settlement agreement attached to the order).   The SEC has, therefore, demonstrated that the FCJ is a valid judicial decree of which the SBM companies had knowledge.

### 2.  Decree in Movant's Favor

The SEC contends that the FCJ was issued in its favor.   The SBM companies disagree, maintaining that the FCJ was not issued in the SEC's favor because it represented a settlement agreement between the parties.   Where a consent judgment is "explicitly directed at affecting [the alleged contemnor's] behavior" in a

that "the contempt power ought not to be deployed" if the terms of a court order are ambiguous.  *Id.* at 18.   Because the court order underlying the contempt motion in *Project B.A.S.I.C.* had not been "explicitly aimed toward" the alleged contemnor, the court declined to hold that party in contempt for its purported failure to comply with the order.  *Id.* at 18.   Nowhere, however, did the *Project B.A.S.I.C.* court indicate that a mere reference to another document within a court order would render the order ambiguous and, therefore, invalid.

manner that inures to the benefit of the moving party, it is in moving party's favor. *Colonial Williamsburg Found.*, 792 F.Supp. at 1406.  This conclusion results even though a consent judgment is, by its very nature, a compromise. *See Eyeticket Corp.*, 2005 WL 2334683, at *3.

In this case, the FCJ requires the SBM companies, among other things, to retain an Independent Consultant to aid them in complying with Section 28, to submit monthly reports to the SEC regarding such compliance, to set aside assets for certificate holders as required by Section 28, and to submit numerous delinquent annual reports.  Because each of these provisions is ultimately geared toward ensuring that the SBM companies comply with securities laws, their compliance with the FCJ will ultimately inure to the SEC's benefit.  Therefore, for purposes of resolving the pending contempt motion, the SEC has demonstrated that the FCJ was issued in its favor.

### 3.   Knowing Violation of the Decree

To succeed in proving that the SBM companies knowingly violated the FCJ, the SEC must make a two-part showing.  First, the SEC must identify the "unequivocal command" in the FCJ requiring the SBM companies to perform the action at issue. *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995). Interpretation of a consent judgment generally involves traditional rules of contract interpretation, and the court

must, therefore, look to the language within "the four corners" of the document to determine whether such an "unequivocal command" has been set forth. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984); *see also Thompson v. HUD*, 404 F.3d 821, 821 (4th Cir. 2005). Second, the SEC must demonstrate that the SBM companies failed to act in accordance with the "unequivocal command" in the FCJ. *See Columbia Gas Transmission Corp. v. Mangione Enters. Of Turf Valley, L.P.*, 964 F.Supp. 199, 203 (D.Md. 1996). Admission by the SBM companies that they were aware of a particular FCJ provision but failed to comply with it is sufficient to prove that a violation has occurred. *Id.*; *United States v. Adams*, 782 F.Supp.2d 229, 247 (N.D.W.Va. 2011), *appeal dismissed*, 442 F.App'x 18 (4th Cir. 2011). The SEC contends that the SBM companies have knowingly violated the FCJ in four respects:  (1) by failing to retain Friend in a timely manner to perform the tasks set forth in the FCJ; (2) by failing to submit monthly reports to the SEC regarding their compliance with Section 28; (3) by failing to deposit asset sale proceeds in a separate account for the benefit of certificate holders; and (4) by failing to submit SBMCC's annual reports for the years 2007 through 2010.  The evidence presented at the hearings on this motion demonstrates that the SEC has made the requisite two-part showing in regard to each of these violations.

### a.   Failure to Retain Friend as Independent Consultant

The SEC first contends that the SBM companies knowingly violated section I(a)(i) of the FCJ because they did not timely engage Friend to perform all of the duties outlined in the FCJ.[15] This section provides that, "[n]o later than 30 days from the date of entry of this [FCJ]," the SBM companies "will retain . . . Friend . . . to serve as an Independent Consultant to them." (ECF No. 214, at 2).  Section I(a)(i) further notes that the SBM companies had previously submitted a copy of Friend's retainer contract to the SEC, and it sets forth a process for replacing Friend with another Independent Consultant should he become "unavailable."  The SBM companies have repeatedly acknowledged that they were aware of these requirements.  (*See, e.g.*, ECF No. 228, at 1-2).  They have also admitted that they failed to retain Friend within thirty days and that Friend has not yet been engaged to perform all of the tasks set forth in the FCJ. (*See id.*) (status report acknowledging that Friend had not been retained as of June 29, 2011 and that the companies did not plan to retain him); (Contempt Mot. Hr'g Tr. 45, Nov. 18, 2011)

---

[15]  The SEC notes that this failure has caused the SBM companies to violate other deadline-based provisions of the FCJ, such as section I(b)(xvii), which requires investor notification regarding Friend's retention within thirty days of entry of the FCJ.   The SBM companies acknowledge that Friend's delayed retention caused these other deadlines to be missed.  (*See, e.g.*, Contempt Mot. Hr'g Tr. 46-47, Nov. 18, 2011).

(Westbury admitting that the SBM companies did not retain Friend, in even a limited capacity, until October 21, 2011).[16]

Despite these admissions, the SBM companies set forth two arguments in an attempt to show that the SEC has not set forth a *prima facie* case of contempt with regard to section I(a)(i). First, the companies contend that the FCJ does not actually require them to retain Friend because Friend's retention serves only "to ensure . . . compliance" with Section 28, and they plan to deregister as investment companies at some future date, thus eliminating the need for such compliance. (ECF No. 240, at 2). That is, because the SBM companies may cease operating as investment companies in the future, there is no current need to retain Friend to ensure compliance with Section 28 until that time. This argument is without merit. Indeed, counsel for the SBM companies conceded as much during the October 17, 2011, hearing when he acknowledged that the companies must abide by section I of the FCJ "as long as [the SBM companies] are face amount certificate companies." (Contempt Mot. Hr'g Tr. 16, Oct. 17, 2011). Because the companies, by their own admission, "have not taken any steps to de-register" (*id.*), they cannot avoid retaining Friend to perform the tasks in the FCJ on that basis.

---

[16] These acknowledgements also indicate that the companies would not have timely retained Friend even if their motions for limited relief or partial stay had been granted. Accordingly, those motions will now be denied as moot.

Second, the SBM companies argue that the issue regarding Friend's retention is moot because Friend "is currently working" to perform a limited number of tasks "prioritized by [the SEC]" and agreed to by the parties. (ECF No. 273, at 9). This argument is also easily dismissed. The October 21, 2011, agreement under which the SBM companies ultimately hired Friend did not supplant the FCJ's requirements as to Friend's tasks. It merely prioritized certain of those tasks to enable Friend to begin working on an "interim" basis for a payment of $50,000. (Contempt Mot. Hr'g Tr. 8, Sept. 13, 2011); (Contempt Mot. Hr'g Tr. 30, Oct. 17, 2011). The evidence indicates, however, that the SBM companies have not provided Friend with payment to perform even these limited tasks.[17] As of November 30, 2011, the companies had paid Friend only $7,100, the proceeds from the September interest payment. This amount is significantly below that needed to fund Friend's preliminary tasks - much less the full range of work contemplated by the FCJ. (See Contempt Mot. Hr'g Tr. 46, 181, Nov. 18, 2011) (Westbury acknowledging that

---

[17] During the November 18, 2011, hearing, counsel for the SBM companies indicated that the companies were not obligated to pay Friend at all because the FCJ does not expressly "direct[] [them] to pay the independent consultant any sum of money." (See Contempt Mot. Hr'g Tr. 119-20, Nov. 18, 2011). This argument strains credulity and must be rejected. Indeed, section I(a)(i) of the FCJ references a retainer contract that, by Westbury's own admission, listed Friend's hourly rate at $585.

18

the October 21, 2011, agreement between the companies and Friend "[wa]s not going to be enough to allow [Friend] to complete" the work contemplated in the FCJ).   Additionally, no evidence was presented that the companies plan to pay Friend any additional money to complete these tasks in the future.[18]   Accordingly, this issue is not moot.

The SEC has made a *prima facie* showing that the SBM companies knowingly violated section I(a)(i) by failing to retain Friend in a timely manner to perform the tasks set forth in the FCJ.

### b.   Failure to Set Aside Various Funds in an Escrow Account for Certificate Holders

The SEC next asserts that the companies knowingly violated section II of the FCJ by failing to place proceeds from the recurring interest payments, the Texas tax sale, and the Ginnie Mae liquidation in an escrow account for certificate holders. The SBM companies vigorously disagree, contending that the SEC misreads the plain language of section II and that none of these funds had to be set aside for the certificate holders.   Section II of the FCJ provides:

> [A]t the time of any asset sale, the [SBM companies] shall deposit into a separate bank account held for the sole benefit of

---

[18]   Indeed, the companies declined to use $7,500 from the October interest payment to fund Friend's work despite agreeing to do so at the September 13, 2011, hearing.

certificate holders, that portion of the net
proceeds from such sale equal to:  (a) the
then accrued interest owed to those who hold
certificates, which as of December 31, 2009
was $1,043,239, plus (b) interest that will
become due and owing to such certificate
holders within 30 days after such sale of
any asset.   This obligation of the
Defendants continues until they become
current in the payment of interest due to
certificate holders . . . .

The companies have admitted that they did not establish a
separate account for proceeds from asset sales and that they did
not set aside any funds from the interest payments, Texas tax
sale, or Ginnie Mae liquidation for their certificate holders.
(Contempt Mot. Hr'g Tr. 51-56, 65, 119, Nov. 18, 2011).  They
assert, however, that proceeds from the recurring interest
payments and the Texas tax sale were not proceeds from an asset
sale.  This assertion is correct.  The interest payments at
issue stem from SBMCC's ownership of a "residual certificate,"
which represents the equity in a mortgage-backed security.  (*Id.*
at 127-28).  Although the residual certificate is a company
asset (*id.* at 118; Pl's Hr'g Ex. 21, at 34), there has been no
showing that the interest payments derive from the *sale* of that
asset.  Rather, these recurring payments represent earnings on
the companies' sustained investment in the residual certificate.
(Contempt Mot. Hr'g Tr. 135, Nov. 18, 2011).  The interest

payments, therefore, do not constitute proceeds from an asset sale.[19]

Similarly, the funds received from the Texas tax sale were not shown to be proceeds from an asset sale. At the hearings, the parties disagreed about whether the proceeds from the tax sale constituted an asset. This disagreement, however, misses the mark. The appropriate inquiry is not whether these proceeds were themselves an asset, but whether the collateral sold to generate the proceeds was an asset. Westbury testified that the collateral secured a loan SBMCC had made to one of its borrowers and that the loan was recorded as an asset on SBMCC's books. The collateral was not itself an asset. Accordingly, its sale – which SBMCC did not initiate - did not require the companies to set aside proceeds in an account for certificate holders.[20]

---

[19] At the November 30, 2011, hearing, the SEC contended that the interest payments should have nonetheless been placed in an escrow account because, under certain circumstances, the company's accounting policies may treat a portion of those payments as a return of principal. No showing was made, however, that such circumstances were present with regard to the interest payments at issue here. Therefore, the merits of this argument need not be addressed.

[20] Even if the sale of the collateral did somehow qualify as an asset sale, the SEC failed to show that the SBM companies *knowingly* violated section II by failing to set aside those proceeds. Knowledge for these purposes can be either actual or constructive. *United States v. Under Seal* (In re *Grand Jury Subpoena*), 597 F.3d 189, 202 (4th Cir. 2010), *cert. denied*, 131 S.Ct. 1470 (Feb. 22, 2011) (No. 10-418). No evidence was presented that the companies were aware – or should have been aware – that the sale of collateral (as opposed to the sale of

The same result does not obtain with regard to liquidation of the Ginnie Mae.  Indeed, Westbury admitted the Ginnie Mae was an asset that had been liquidated and the proceeds were not set aside for certificate holders.  (Contempt Mot. Hr'g Tr. 51, Nov. 18, 2011).  The companies present two arguments to demonstrate that their failure to escrow these funds did not violate section II.  First, they maintain that section II of the FCJ only requires them to set aside funds where the proceeds from the sale are "equal to" the outstanding interest due to certificate holders at that time.  (ECF No. 273, at 3).  This argument distorts the plain language and purpose of section II.  Taken to its logical conclusion, this construction would virtually never require the companies to set aside any proceeds, as the amount of outstanding interest on the face-amount certificates is continually changing.  The SBM companies' proposed interpretation would also render the final sentence of section II – regarding the need for continued deposits until all interest payments are current – meaningless.  Such results are contrary to well-established principles of contract interpretation, and the companies' argument must, therefore, fail.  *See, e.g.*, *Holland v. Psychological Assessment Res.*, 482

---

the loan itself) constituted an asset sale.  In fact, Westbury's testimony was to the contrary, indicating that the companies did not believe these funds fell within the purview of section II based on their definition of "asset."  (Contempt Mot. Hr'g Tr. 113-15, Nov. 18, 2011).

F.Supp.2d 667, 676 (D.Md. 2007) (citing "basic principles of contract interpretation that terms . . . be construed so that none are rendered superfluous").

Second, Westbury testified that the companies did not set aside the proceeds from the Ginnie Mae liquidation because they did not believe the FCJ required "every cent that came into the companies [to be] set aside for this escrow account." (Contempt Mot. Hr'g Tr. 119, Nov. 18, 2011). To the extent this assertion is an attempt to show that the violation here was not committed knowingly, it is unpersuasive. Constructive knowledge of a violation will suffice, and given the plain language of section II of the FCJ, a person exercising "reasonable care or diligence" would have been aware that the proceeds from the Ginnie Mae liquidation – an acknowledged asset sale – needed to be set aside for certificate holders. *See* Black's Law Dictionary 404 (3$^d$ pocket ed. 2006) (defining "constructive knowledge"). Because these funds were not set aside, much less placed in a separate bank account for certificate holders, the SEC has made a *prima facie* showing that the SBM companies knowingly violated section II of the FCJ.

### c. Failure to Submit Monthly Reports to the SEC Regarding Compliance with Section 28

The SEC further contends that the SBM companies knowingly violated section I(c) of the FCJ by not submitting monthly

reports to the SEC regarding their steps toward compliance with Section 28.   Section I(c) requires "each Defendant [to] provide the Commission staff with monthly reports on steps taken toward compliance with Section 28."   The companies have acknowledged that they did not comply with this requirement.   (*See* ECF No. 228, at 3).   They maintain that their failure to provide this reports does not violate section I(c) because Friend was not retained until mid-October 2011, and the reports required Friend's participation.

This argument, however, overlooks that the monthly reporting requirement exists independently from the duties that Friend will perform as Independent Consultant.   Indeed, section I(c) does not mention the term "Independent Consultant," while earlier sections of the FCJ that contemplate Friend's involvement in various tasks expressly mention him and articulate his role in fulfilling those tasks.   (*See, e.g.*, ECF No. 214 § I(b)(iii)) (discussing the role of the Independent Consultant in preparing the "Initial Report to the Board of Directors").   In the face of such plain language, the companies' admitted failure to provide any monthly reports regarding compliance with Section 28 is sufficient for the SEC to demonstrate a knowing violation of section I(c) of the FCJ.

     **d.   Failure to File Annual Reports for the Years 2007 Through 2010**

     The final FCJ violation alleged by the SEC is SBMCC's failure to submit its annual reports for the years 2007 through 2010. This requirement is set forth in the signed Consent annexed to the FCJ, which is incorporated into the FCJ and has "the same force and effect as if fully set forth [t]herein." (*Id.* § IV). According to paragraph three of the Consent, SBMCC was required to file its "delinquent annual report[s]" for the years 2007 through 2010 no later than 180 days after entry of the FCJ. Westbury has acknowledged that SBMCC was aware of this deadline, that it passed on August 28, 2011, and that none of the annual reports has yet been filed. (Contempt Mot. Hr'g Tr. 47, Nov. 18, 2011).

     SBMCC contends that "[t]his late-breaking allegation was not a part of Plaintiff's [contempt] motion," and thus cannot be used as a basis for holding the companies in contempt. (ECF No. 273, at 3). This argument is meritless. The SEC's initial motion for contempt, filed on August 24, 2011, explicitly noted that the companies' failure to meet this deadline was imminent. Additionally, at each hearing on this motion, the SEC raised this issue as a violation of the FCJ and, therefore, as a basis for contempt. Because SBMCC admitted its failure to file these delinquent annual reports despite awareness of the requirement

to do so, a *prima facie* showing that the company knowingly
violated this provision has been made.

### 4.   Harm to the Movant

The final element in the SEC's case for civil contempt is
harm to the movant.  Here, the SEC must demonstrate that it has
suffered harm as a result of the SBM companies' failure to
comply with the FCJ.  The SEC contends that "as a matter of law,
where the Commission is a litigant, this factor is satisfied by
a demonstration that the Order has been violated."  (ECF No.
234-1, at 20).  The SEC cites *SEC v. Dowdell* in support of this
proposition.

*Dowdell*, however, does not stand for such a principle.  In
that case, the SEC had obtained a temporary restraining order
enjoining the defendants from violating the securities laws,
freezing certain assets, and setting various discovery
deadlines.  When the defendants nonetheless failed to identify
their assets and attempted to dispose of them without the SEC's
knowledge, the SEC sought to hold them in civil contempt.
Ultimately granting this request, the *Dowdell* court evaluated
each of the four elements necessary to prove contempt, reasoning
that the "fourth element – that the movant suffered harm as a
result [of the violation] – [could] be easily disposed of in
favor of the SEC" based on the facts of the case.  2002 WL
31248028, at *2.  At no point did the *Dowdell* court hold that

26

the SEC's position as a litigant will itself suffice to demonstrate the harm element in an action for civil contempt. For this reason, the SEC must make an additional showing to satisfy this element and succeed in setting forth its *prima facie* case.

Based on the facts of this case, such a showing has been made.  The FCJ required the SBM companies to perform numerous tasks geared toward not only compliance with Section 28, but also increased transparency and protection of certificate holders.  By failing to retain Friend until late October (then refusing to fund his work on even limited tasks) and failing to provide the SEC with required reports, the companies have deprived the SEC of this transparency and prevented it from determining whether the interests of certificate holders remain protected.  Indeed, the evidence produced at the hearings suggested that the lack of oversight since the entry of the FCJ has allowed the companies to dissipate certain assets that belong to certificate holders and has even enabled Westbury to remove company funds to pay his children's school tuition.  In light of these facts, the SEC has demonstrated that it suffered harm due to the companies' failure to comply with the FCJ.  *Cf. Adams*, 782 F.Supp.2d at 247 (explaining that a defendant's failure to repatriate funds in accordance with a court order had caused the government to suffer harm because the defendant might

have been able to dissipate assets or otherwise place them outside the court's jurisdiction in the interim).

Because the SEC has met its burden with respect to these four elements, a *prima facie* showing of civil contempt has been made.

**B.    Whether the SBM Companies Have Proven Their Inability to Comply with the FCJ**

The burden now shifts to the companies to demonstrate that they have a valid defense for violating the FCJ. There are two currently recognized defenses to civil contempt:  (1) inability to comply with the court's decree, and (2) substantial compliance with the court's decree.[21]  *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding . . . , a defendant may assert a *present* inability to comply with the order in question."); *see generally JTH Tax, Inc. v. H&R Block E. Tax. Servs., Inc.*, 359 F.3d 699 (4th Cir. 2004) (analyzing the substantial compliance defense raised by an alleged contemnor). The SBM companies assert only the former defense, contending

---

[21]   At one time, the Fourth Circuit considered an alleged contemnor's good faith to be a stand-alone defense to civil contempt. *See Consol. Coal Co. v. United Mineworkers of Am., Local 1702*, 683 F.2d 827, 832 (4th Cir. 1982). But because "[t]he absence of wilfulness does not relieve from civil contempt," *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949), the Fourth Circuit subsequently rejected this defense, holding that "good faith alone does not immunize a party from a civil contempt sanction," *McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) (citing *McComb*, 336 U.S. at 191).

that their financial inability to comply with the FCJ precludes the court from finding them in civil contempt.

At the outset, it must be recognized that this defense applies to only two of the companies' FCJ violations – failure to retain Friend to perform the tasks set forth in the FCJ and failure to file delinquent annual reports.[22]  The remaining FCJ provisions at issue, which relate to setting aside asset sale proceeds and filing monthly reports with the SEC regarding Section 28 compliance, did not require expenditure of funds. Thus, inability to pay is irrelevant to the companies' violations of these provisions, and they are, therefore, in civil contempt as to those violations.  Whether the inability-to-comply defense precludes a contempt finding with regard to Friend's retention and submission of audited annual reports requires additional analysis.

The burden of establishing an inability-to-comply defense is difficult to sustain.  Indeed, the SBM companies must present evidence regarding their present inability to comply with the FCJ, and they must make this showing "categorically and in detail." *Rylander*, 460 U.S. at 757.  Conclusory assertions of financial inability, unsubstantiated by supporting

---

[22]  The SEC requires these reports to be audited by an accounting firm prior to their submission, and the SBM companies have contended that they did not have the funds to pay the auditors.

documentation, are insufficient to satisfy this burden. *In re Gentry*, 275 B.R. 747, 753 (Bankr.W.D.Va. 2001); *SEC v. Bilzerian*, 112 F.Supp.2d 12, 23 (D.D.C. 2000), *aff'd*, 75 F.App'x 3 (D.C.Cir. 2003). Rather, the companies must show that they acted in good faith and took all reasonable efforts to comply with the court's order. *United States v. Conces*, 507 F.3d 1028, 1043 (6th Cir. 2007), *cert. denied*, 553 U.S. 1042 (2008); *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998).

The companies assert that they were unable to comply with the FCJ with regard to Friend's retention because they lacked the financial resources to fund his set-aside requests in full.[23] According to the companies, when Friend requested a set aside of $500,000, they did not have access to funding in that amount. Similarly, at the time Friend lowered this request to $150,000, and then to $50,000, the companies did not have money on hand to pay those amounts in their entirety. Therefore, the companies

---

[23] Although not addressed in their briefs, the companies did assert at the hearings that this lack of resources also precluded them from submitting the audited annual reports to the SEC. The analysis that follows with regard to Friend's retention is equally applicable to that circumstance, particularly as the companies presented no evidence regarding the approximate cost of these audits or whether their accounting firm would agree to perform the audits pursuant to an extended payment schedule. *Cf. Bilzerian*, 112 F.Supp.2d at 26 (noting that a party must demonstrate that "all reasonable avenues . . . have been explored and exhausted" in order to succeed in demonstrating inability to comply) (internal quotation marks omitted).

maintain, they were unable to comply with the FCJ's mandate regarding retention of an Independent Consultant.

This argument, which focuses only on the sufficiency of the companies' financial resources at three specific points in time, misses the point.  Indeed, inability to comply would only be "a complete defense" if the companies were unable to comply in any manner with the mandate in section I(a)(i) regarding retention of an Independent Consultant.  *Cf. Bilzerian*, 112 F.Supp.2d at 17 (explaining that inability to comply is "only a complete defense" with regard to payment of a judgment if the party is unable to "pay any of the judgment").  Otherwise, in order to demonstrate that they have undertaken reasonable and good faith efforts to comply with the FCJ, the companies must show that they attempted to retain an Independent Consultant "to the extent that [their] finances [would] allow."  *See Loftus v. Se. Pa. Transp. Auth.*, 8 F.Supp.2d 464, 468 (E.D.Pa. 1998), *aff'd*, 187 F.3d 626 (3[d] Cir. 1999), *cert. denied*, 528 U.S. 1047 (1999); *see also SEC v. Musella*, 818 F.Supp. 600, 602 (S.D.N.Y. 1993) ("When a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense. Otherwise, the party must pay what [it] can.") (citations omitted).  The companies have not argued that they proposed an alternate Independent Consultant to the SEC – in accordance with section I(a)(i) of the FCJ - because Friend's retainer request

rendered him "unavailable."   Therefore, to succeed on their inability-to-comply defense, the companies must prove that they were either completely unable to pay Friend or that they attempted to retain him to the extent their finances would permit.   The companies wholly fail to make this showing.

From March through August of 2011, the companies received checks for more than $96,000 from interest payments and the Texas tax sale.   Westbury cashed these checks, for a five percent charge, at a local check-cashing facility.[24] Documentation submitted at the hearings, however, indicated that only approximately $19,000 of the remaining $91,000 was used to pay legitimate business expenditures.[25]   Thus, approximately

---

[24] The companies do not currently have any bank accounts and, therefore, are unable to cash checks at a bank.

[25] The $19,000 in expenditures consisted principally of a $10,600 payment for telecommunication services, a $4,000 payment for rent, and approximately $3,000 in legal fees.   Westbury testified that the remaining funds were also used to pay valid business expenses, but given his status as an interested party, these assertions are not credible without supporting documentation to substantiate them.   *See, e.g.*, *In re Gentry*, 275 B.R. at 753.

The SEC argues that most of the "substantiated" expenditures should be disregarded in evaluating the companies' inability-to-comply defense because these expenses were actually incurred by SBM Financial Group, the company that once performed administrative services for SBMIC and SBMCC.   This argument need not be resolved here, however, because even assuming that these expenditures were legitimate, the SBM companies will not succeed in demonstrating inability to comply.   For similar reasons, the SEC's contention that the companies were obligated to use *all* funds received to fund Friend's work need not be addressed.

$72,000 would presumably have been available to fund Friend's work. The companies, however, set forth no evidence that any portion of this money was ever offered to Friend. Indeed, the evidence presented at the hearings was to the contrary. After receiving Friend's May 25, 2011, letter, which proposed reducing the requested retainer from $500,000 to $150,000 and welcomed Westbury's "thoughts" on that proposal (Def.'s Hr'g Ex. 7, at SBM-MWHITE 2333), the companies ceased all negotiations with Friend (Contempt Mot. Hr'g Tr. 173, Nov. 18, 2011). By Westbury's own admission, he did not respond to this letter even after learning one month later about the Texas tax sale proceeds. Rather, he used approximately $37,000 of those proceeds to pay his personal expenses. In light of these facts, the companies have failed to show that they engaged in reasonable, good faith efforts to retain Friend. Their argument that limited financial resources precluded them from complying with section I(a)(i) of the FCJ is, therefore, unpersuasive. *Cf. Musella*, 818 F.Supp. at 602 (rejecting an inability-to-comply defense where the defendant was "able to pay more" of a judgment than he offered to pay).

The companies also assert that they were unable to retain Friend because he did not request a set aside or an "Evergreen

Retainer" until after entry of the FCJ.[26]   According to their post-hearing brief, "contempt [cannot] be found for failure to meet terms not . . . contained in the injunction or in documents incorporated into the injunction." (ECF No. 273, at 5).   To the extent this argument is premised on the companies' failure to fund Friend's retainer in full, it misunderstands the reason they are being held in contempt.   It was the companies' failure to make reasonable and good faith efforts to fund Friend's work at any level – not their failure to fund that work in its entirety – that led to the finding of contempt.   To the extent the companies are arguing that the belated request for a set aside or retainer itself precludes a finding of contempt, this contention is also without merit.   Indeed, counsel for the SBM companies essentially conceded this point when acknowledging that any person undertaking the position of Independent Consultant would require prepayment.   (Contempt Mot. Hr'g Tr. 111-12, Nov. 30, 2011) (stating that it was "rational to expect that a consultant would want a retainer").   The companies also had the option of proposing an alternate Independent Consultant if they found Friend's set-aside request overly burdensome, but no evidence was presented that they ever did so.

_____

[26] The SEC maintained in argument that the companies knew of this request during negotiation of the FCJ, but no evidence was ever presented to support this contention.

For these reasons, the companies have not met their burden of demonstrating that they were unable to comply with the FCJ. Accordingly, they will be held in civil contempt.

**C.    Determining the Appropriate Remedy for Defendants' Contempt**

The focus must now turn to the remedy for Defendants' contempt.  The SEC seeks an order directing the companies to do the following:  (1) to pay a fine in the amount of $73,039.64 that will be placed in escrow for the sole benefit of face-amount certificate holders; (2) to remit all future payments from the Option One CTS BYN Mellon annuity to the Independent Consultant as a means to finance his work and to require the companies to notify the SEC and the court of the receipt of any funds; (3) to begin providing the monthly reports required by section I(c) of the FCJ; (4) to prepare an inventory listing all of the companies' liabilities; and (5) to report to the court and the SEC regarding the filing status of SBMCC's delinquent annual reports for the years ended December 31, 2007, 2008, 2009, and 2010.  The SEC also seeks an order directing the Independent Consultant to prepare an inventory of all the companies' assets, including those sold since January 1, 2007, to assess what assets are available to meet the companies' obligations under the FCJ.

The court has discretion to fashion an appropriate remedy following a finding of civil contempt. *In re Gen. Motors Corp.*, 61 F.3d at 259. In so doing, however, the court must use the "least possible power adequate to the end proposed." *Spallone*, 493 U.S. at 280. The purpose of any sanction imposed must be wholly remedial and intended to coerce the party's compliance with a court order or to compensate for damage from the contemnor's non-compliance; it cannot be punitive. *Id.; Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975).

The specific remedies now sought by the SEC were set forth in its post-hearing brief, which was filed after the hearings and the companies' post-hearing brief. The companies, therefore, have not yet had an opportunity to comment on this request. For that reason, once the parties have had a chance to review this memorandum opinion, a further hearing will be held on remedy.

## III. Conclusion

For the foregoing reasons, the SEC's motion to hold the SBM companies in contempt of court and for expedited discovery in advance of the September 13, 2011, hearing will be granted in part and denied in part as moot. A hearing will be scheduled to determine the proper remedy for the companies' contempt. The companies' motion to extend the time to file an opposition to

the SEC's motion will be granted, while the remaining motions
will be denied as moot.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge